CANADIAN NATIONAL RAILWAY COMPANY, and Canadian Pacific Limited, Plaintiffs,

v.

The UNITED STATES of America and the Interstate Commerce Commission, Defendants,

and

Aluminum Company of Canada, Ltd., et al., Intervening Defendant.

No. 74–167.

United States District Court, District of Columbia

Nov. 30, 1976.

**292**

Richard J. Flynn, Lee A. Monroe, Sidley & Austin, Washington, D. C., for plaintiffs.

Thomas E. Kauper, Asst. Atty. Gen., John H. D. Wigger, Atty., Dept. of Justice, Washington, D. C., for U. S.

Fritz R. Kahn, Gen. Counsel, Lloyd John Osborn, Atty., I. C. C., Washington, D. C., for I. C. C.

James H. Pipkin, Jr., Steptoe & Johnson, Washington, D. C., for Akron Canton & Youngstown Railroad Co., et al., additional defendants to counterclaim.

Preston C. King, Jr., Dickson R. Loos, Barry Roberts, Pope, Ballard & Loos, Washington, D. C., for Aluminum Co. of Canada, Ltd., intervening defendant.

Before MACKINNON, Circuit Judge, and WADDY and PRATT, District Judges.

## MEMORANDUM OPINION

WADDY, District Judge.

### I. *The Procedural Background*

This is an action by plaintiffs to set aside an Order of the Interstate Commerce Commission (the Commission) entered in an administrative general revenue proceeding identified as Ex Parte No. 267, *Increased Freight Rates, 1970 and 1971*.[1] The Order here challenged is dated August 6, 1973, and concerns freight rate increases authorized for railroads operating between points in Eastern Territory of the United States and points in Canada, and purports to be an interpretation or clarification of the Commission's Report and Order in Ex Parte No. 267. By Order dated October 5, 1973, the Commission denied petitions by the railroads to vacate the August 6th Order. The original defendants and defendant-intervenor have counterclaimed seeking enforcement of the Orders and have joined additional parties defendant to the counterclaim.

Jurisdiction of this Court is invoked under 49 U.S.C. § 17(9), 5 U.S.C. § 559, and 28 U.S.C. §§ 1336, 2284, 2321–2325. Pursuant to 28 U.S.C. § 2325 (since repealed) an action having a filing date of this case required determination by a three-judge court.[2]

Plaintiffs are Canadian National Railway and Canadian Pacific Limited (Canadian railroads). Both are common carriers by railroad, engaged in the transportation of property in Canadian commerce and in foreign commerce, including commerce between the United States and Canada. Both operate partially within the United States. Defendants are the United States of America[3] and the Interstate Commerce Commission (defendants). Defendant-intervenor Aluminum Company of Canada, Ltd. (Alcan) is a corporation organized under the laws of Canada, engaged in the production, fabrication and sale of aluminum and aluminum products. Alcan ships products from origins in Canada to points in the United States and also receives materials

---

1. The Commission's Report and Order in that proceeding are reported at 339 I.C.C. 125 (1971).

2. Effective January 2, 1975 proceedings to enjoin orders of the Interstate Commerce Commission are to be brought in the United States Court of Appeals. 28 U.S.C. § 2321(a).

3. 28 U.S.C. § 2322 requires the United States be named a defendant in any action to enjoin, suspend, annul, or set aside an order of the Interstate Commerce Commission.

from origins in the United States destined to points in Canada.[4]

Pursuant to 49 U.S.C. § 16(12)[5] defendants and defendant-intervenor Alcan each filed counterclaims seeking enforcement of the Commission's August 6th, and October 5th, 1973, Orders and moved to add 32 additional railroads (Eastern railroads) as parties defendant to the counterclaims. Each of the additional defendants was a party to the Ex Parte No. 267 proceeding, each participates in the movement of traffic between points in Eastern Territory and points in Canada, and each is subject to the Commission's Orders. This Court granted the motions to add the Eastern railroads as parties defendant to the counterclaims, and held that the three-judge court had jurisdiction to hear said counterclaims, and that it was a proper exercise of discretion to consider both the claim and the counterclaims jointly.[6]

The case is now before the Court on the motions of all parties for summary judgment. The Canadian railroads' claim requires the Court to determine whether the Commission, in its Orders dated August 6, 1973 and October 5, 1973, interpreted and clarified its Report and Order in Ex Parte No. 267, or whether it improperly entered supplemental orders without notice and hearing. The counterclaims for enforcement of the Orders require the Court to determine whether, through the tariff updating process, the Eastern railroads issued new rate increases independent of Ex Parte No. 267.

■ Preliminarily, it is noted that the Court's function in determining the validity of these Commission Orders is not to conduct a trial *de novo,* but is

"limited to ascertaining whether there is warrant in the law and the facts for what the Commission has done. Unless in some specific respect there has been prejudicial departure from requirements of the law or abuse of the Commission's discretion, the reviewing court is without authority to intervene. It cannot substitute its own view concerning what should be done, whether with reference to competitive considerations or others, for the Commission's judgment upon matters committed to its determination, if that has support in the record and the applicable law." *United States, v. Pierce Auto Freight Lines, Inc.,* 327 U.S. 515, 536, 66 S.Ct. 687, 698, 90 L.Ed. 821 (1946).

## II. *The Facts*

Pursuant to petitions filed in 1970 and 1971 by most of the railroads in the United States, the Commission instituted an investigation concerning the adequacy of all freight rates and charges of all common carriers by railroad in the United States. On March 4, 1971, as a result of the investigation and hearings, the Commission issued its Report and Order, Ex Parte No. 267, *Increased Freight Rates, 1970 and 1971* authorizing general freight rate increases as follows:

"(1) Intraterritorial traffic within the East—not more than 14 percent.

(2) Intraterritorial traffic within the South—not more than 6 percent.

(3) Intraterritorial traffic within the West—not more than 12 percent.

---

4. The Aluminum Company of Canada was a party in interest to the Ex Parte No. 267 proceeding before the Commission and intervened as of right pursuant to 28 U.S.C. § 2323.

5. 49 U.S.C. § 16(12) provides:

"If any carrier fails or neglects to obey any order of the commission other than for the payment of money, while the same is in effect, the Interstate Commerce Commission or any party injured thereby, or the United States, by its Attorney General, may apply to any district court of the United States of competent jurisdiction for the enforcement of such order. If, after hearing, such court determines that the order was regularly made and duly served, and that the carrier is in disobedience of the same, such court shall enforce obedience to such order by a writ of injunction or other proper process, mandatory or otherwise, to restrain such carrier, its officers, agents, or representatives, from further disobedience of such order, or to enjoin upon it or them obedience to the same."

6. *See* Order of this Court dated July 24, 1974.

(4) Interterritorial traffic from and to all territories—not more than 12 percent. (5) Import and export traffic not more than 12 percent and subject to the limitations heretofore prescribed in this report . . . ." 339 I.C.C. at 257.

Ex Parte No. 267 was a *general revenue increase proceeding.* In Aberdeen & Rockfish R. Co. v. SCRAP, *422 U.S. 289, 95 S.Ct. 2336, 45 L.Ed.2d 191 (1975), the Court observed that in such proceedings,*

> "The ICC's inquiry has tended to focus on whether the railroads are really in need of increased revenues and has tended to leave for individual rate or refund proceedings under 49 U.S.C. §§ 13 and 15 the problem of determining just which commodities on which runs should bear the increased burden and to what extent. The ICC is careful to leave such refund claims open by including in the general revenue order a statement [leaving open the determination of particular rates]." *Id.*, 422 U.S. at 313, 95 S.Ct. at 2352.

The Court went on to say:

> "Of course, the ICC has the power in a general revenue proceeding to declare the new rates unlawful and disapprove the increase. It could also, if it chose, declare some of the rates discriminatory, unreasonable or otherwise unlawful; and it could itself affirmatively approve all or some of the rates as just and reasonable. But under the *Louisiana* case [*United States v. Louisiana,* 290 U.S. 70, 54 S.Ct. 28, 78 L.Ed. 181 (1933)], the general rule has been that the ICC may confine its attention in general revenue proceedings almost entirely to the need for revenue and to any other factors that relate to the

legality of the general increase as a whole;" *Id.,* 422 U.S. at 313–314, 95 S.Ct. at 2353.

A general revenue order is permissive in nature, and increases taken pursuant to it provide certain advantages for the railroads, *e. g.,* the use of the short-cut Master Tariff, institution of rate increases on less than statutory publication, a shifting of the burden of proof as to whether the rates are reasonable and just.[7]

■ When the Commission issues a general revenue order, it customarily refrains from exercising its power to suspend tariffs filed pursuant to that order *if such tariffs are within the level authorized.* The rates are still carrier-made, but such rates must be within the limits authorized by Commission Order if the carriers wish to partake of the advantages offered by a general revenue proceeding. The lawfulness of individual rates may still be challenged by a complaint under Section 13 or by independent Commission action under Section 15.

Shortly after the issuance of the Ex Parte No. 267 Order, the railroads published short form Master Tariff X–267–B. The Commission relaxed the statutory 30 day notice requirement,[8] and allowed the railroads to publish their Master Tariff X–267–B on 15 days notice. This Master Tariff increased both water-rail and direct-rail rates between points in Eastern Territory of the United States and points in Canada by 14 percent. The Commission did not, either upon complaint or upon its own initiative, suspend the operation of this tariff as it is empowered to do under 49 U.S.C. § 15(7). The rates became the effective legal rates[9] on April 12, 1971.

7. Background statement, Joint Brief in Support of Defendants' Motion for Summary Judgment and in Opposition to Plaintiffs' Motion for Summary Judgment, at 3–7. Eastern railroads agree this is a fair and accurate characterization of general revenue orders, Tr. of Hearing, January 20, 1976, at 85.

8. 49 U.S.C. § 6(3) provides: "No change shall be made in the rates, fares, and charges * * which have been filed and published by any common carrier in compliance with the requirements of this section, except after thirty

days' notice to the Commission and to the public published as aforesaid * * *: *Provided,* That the Commission may, in its discretion and for good cause shown, allow changes upon less than the notice herein specified * * *."

9. When a new carrier-made rate becomes effective, it constitutes the "legal" rate which carriers charge and shippers must pay. A "legal" rate, however, is not necessarily a "lawful" rate for the Commission may, upon investiga-

On August 19, 1971, the Commission applied its Ex Parte No. 267 Order to shipments of iron ore and entered a cease and desist Order [10] declaring that

". . . iron ore moving from Canada, as described in the petitions, by direct rail or by water-rail to destinations in Eastern Territory is *import traffic* within the meaning of that term as used in the Commission's [Ex Parte No. 267] decision". (Emphasis supplied)

The railroads did not challenge the Order to cease and desist assessing rates and charges on import iron ore containing increases of more than 12 percent and revised their tariffs accordingly.

The next event in sequence occurred when the Commission entered its Order of August 6, 1973 now under review. This Order grew out of a petition filed by the Sun Oil Company of Pennsylvania seeking a declaratory order that the 14 percent increase on traffic rates applicable to refined petroleum, petroleum products and naphthalene, and alternatively, to all commodity rates moving in all-rail service from points in Eastern Territory to points in Canada, was in violation of the Commission's Ex Parte No. 267 Order. After finding that resolution of the issues in the petition required an "interpretation or clarification" of the Ex Parte No. 267 Report and Order, the Commission concluded that

". . . all traffic moving from all points in the United States to all destinations in Canada by direct rail or water-rail (including refined petroleum, petroleum products, and naphthalene) is *export traffic* within the meaning of that term as used in the cited report and order;" (Emphasis supplied)

On August 23, 1973, defendant-intervenor Alcan petitioned the Commission to apply the August 6th Order to traffic moving from Canada to the United States as well as traffic from the United States to Canada. On August 31, 1973, the Eastern railroads filed a petition to vacate the August 6th Order and for an opportunity to be heard. A similar petition was filed by the Canadian railroads on September 4, 1973.

The Commission entered its Order on October 5, 1973, denying the railroads' petitions and ordering them

"to cease and desist from charging rates on *export-import traffic* moving by all-rail or rail-water routes between Canada and Eastern Territory which have been increased by more than 12 percent over the Ex Parte No. 265 level," (Emphasis supplied)

and further ordering them to correct their tariffs accordingly.

Prior to the Commission's Orders of August 6th and October 5th, the Eastern railroads had revised and updated their *individual commodity rate tariffs.* The current rail rates between Eastern Territory and Canada, with the principal exception of iron ore, contain increases of 14 percent. In so doing, the railroads gave the 30 day notice required by 49 U.S.C. § 6(3) but did not utilize symbols or otherwise indicate on the commodity tariffs that new rate increases were being proposed. The Commission did not exercise its Section 15(7) suspension powers with respect to these commodity tariffs. As a clue to the Eastern railroads' ultimate position, counsel for the Eastern railroads advised the Commission, by letter on October 16, 1976, that the railroads' tariff updating had been completed and "there were, therefore, no tariffs publishing rates between Eastern territory and Canadian points which are dependent on Ex Parte

tion, find the rate to be unreasonable or otherwise unlawful.

10. This Order was entered September 24, 1971 pursuant to a Petition filed by the Alan Wood Steel Company for a Supplemental Order in Ex Parte No. 267 that certain iron ore traffic moving by water-rail containing 14 percent rate increases violated the Commission's Order.

The Jones and Laughlin Steel Corporation intervened in the proceeding seeking a determination which included iron ore moving in all-rail service from Eastern Canada to its facilities in Pennsylvania. The railroads had been served with copies of the petitions and filed replies with the Commission.

No. 267 Orders."[11] The Commission did not reply to this letter and took no action with respect to its two Orders until it filed its counterclaim in this case on April 29, 1974. No changes have been made to reduce the commodity tariff increases to 12 percent.

### III. *The Contentions of the Canadian Railroads*

■ The Canadian railroads, in substance, contend that the Commission Orders at issue herein constitute supplemental orders or modifications reflecting an abrupt departure from the Order in Ex Parte No. 267, and were allegedly issued without adequate or proper notice or an opportunity to be heard.[12] This conclusion, plaintiffs assert, is supported by the meaning ascribed to the term "export-import" in the Ex Parte No. 267 Report and Order, in prior Commission decisions, and by the sense in which the term is understood in the railroad industry. In their view, the term "export-import" should be read to mean that traffic which moves through United States ports to or from foreign points.[13]

Defendants' and defendant-intervenor Alcan's position is that the Commission correctly viewed the Orders as "interpretations or clarifications" of the Ex Parte No. 267 Report and Order. They assert that the Orders were therefore exempt from the notice and hearing requirements of Section 4(b) of the Administrative Procedure Act (5 U.S.C. § 553(b)(A),[14] and further that the railroads participated fully in the determination of the same interpretive issue in connection with the Order of September 24, 1971 on the Alan Wood and Jones and Laughlin petitions as previously noted.[15]

■ In the Ex Parte No. 267 Report and Order, the Commission authorized an increase of 12 percent for export-import traffic. However, it did not define the term "export-import". Admittedly, the references in the Report to "seaports" and "port relationships" are ambiguous and confusing. 339 I.C.C. at 187–188. According to the record, certain port interests had asserted that disparities between regional rate authorizations created greater percentage increases on similar traffic, thereby resulting in discrimination, preference and prejudice. The Commission was concerned with maintaining relationships among ports and ruled clearly as to the authorized increases on export-import traffic moving through these port interests. Thus, the Report, particularly when setting forth the limitations on the authorized 12 percent increase, makes reference to export-import traffic moving, *e. g.,* "through various seaports", "through ports on the Great Lakes", "through Atlantic or gulf ports", and "through ports on the Pacific coast or west gulf ports".[16] When viewed in context, however, those references do not support the conclusion that export-import traffic was necessarily meant to be limited to that traffic flowing through a seaport.

On the other hand, the Canadian railroads concede, as they must, that in the customs sense, all-rail traffic moving be-

---

**11.** Exhibit attached to Eastern railroads' answers to the counterclaims of the United States and the Commission and of Alcan.

**12.** Under 49 U.S.C. § 16(6) the Commission may ". . . modify its orders upon such notice and in such manner as it shall deem proper." The Commission's authority to modify or amend its previous orders to remove an ambiguity without further hearing, however, is limited to instances in which the subject matter was within the scope of the previous proceeding. *Pennsylvania Railroad Co. v. United States,* 288 F. 88 (W.D.Pa.1923).

**13.** Master Tariff X–267–B, however, also raised rates on water-rail traffic by 14 percent.

**14.** The Section 553(b)(A) exemption provides: "Except when notice or hearing is required by statute, this subsection does not apply—(A) to interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice;"

**15.** *See* note 10, *supra.*

**16.** 339 I.C.C. at 187–189.

tween the United States and Canada is export-import traffic. They contend, however, that voluntarily maintained "joint international through rates", established at levels related to the rates applicable to the same commodities moving domestically within the United States and Canada, and not "export-import rates", have traditionally been applicable to such traffic.[17] Defendants and defendant-intervenor Alcan do not dispute that most all-rail traffic moves under joint international through rates, but point out that at times such traffic may move under export-import rates. Thus, while the all-rail traffic involved herein apparently can and does move under different rates, it is clear that the basic character of the traffic itself remains unchanged—it is "export-import traffic",[18] and that is the language used in Ex Parte No. 267.[19] It also appears that in the past the Commission has explicitly authorized a separate increase on joint international through rates when such an increase is a different increase from that authorized for export-import traffic.[20] And finally, the Commission specifically subjected the 12 percent increase authorized for export-import traffic to certain limitations. Among those enumerated was

"(3) The term export traffic shall include traffic which moves in such trade whether or not the rate upon which it moves to the port is designated as an export rate." 339 I.C.C. at 188.

Defendants and defendant-intervenor Alcan contend that the challenged Orders are interpretations and clarifications of the Ex

Parte No. 267 Report and Order. Thus, the issue is joined.

In *Gibson Wine Co. v. Snyder*, 90 U.S. App.D.C. 135, 194 F.2d 329 (1952), the Court of Appeals for this Circuit commented at 331 that

"Generally speaking, it seems to be established that 'regulations', 'substantive rules' or 'legislative rules' are those which create law, usually implementary to an existing law; whereas interpretative rules are statements as to what the administrative officer thinks the statute or regulation means."

■ An administrative interpretation is of controlling weight unless it is "plainly erroneous or inconsistent with the regulation." *Bowles v. Seminole Rock Co.,* 325 U.S. 410, 414, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945). *See also, Thompson Phosphate Co. v. Atlantic Coast Line R. Co.,* 282 F.Supp. 698 (S.D.N.Y.1968). The same is true of administrative interpretations of orders. *Pesikoff v. Secretary of Labor,* 163 U.S.App.D.C. 197, 501 F.2d 757, 763, n. 12 (1974), *cert. denied,* 419 U.S. 1038, 95 S.Ct. 525, 42 L.Ed.2d 315 (1974); *Gibson Wine Co. v. Snyder, supra.*

■ The particular label placed on an agency action is not necessarily conclusive, but it is rather the substance of what the agency has purported to do and has done which is decisive. *Columbia Broadcasting System, Inc. v. United States,* 316 U.S. 407, 416, 62 S.Ct. 1194, 86 L.Ed. 1563 (1942).

■ The facts and the record herein lead to the conclusion that the challenged

---

17. A "joint rate" is a rate that extends over the lines of two or more railroads, as distinguished from a "local rate", which extends over the lines of only one carrier. A "through rate" is the total rate from a point of origin to a certain destination and may be a local rate, a joint rate, or a combination of separately established rates. "Export and import" rates are a class of rates applicable to shipments to and from foreign countries. Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Summary Judgment at 8; Joint Brief in Support of Defendants' Motion for Summary Judgment and in Opposition to Plaintiffs' Motion for Summary Judgment at 16, n. 11.

18. Affidavit of H. F. Hynes, at 2, attached to defendant-intervenor Alcan's Motion for Summary Judgment. Affidavit of Martin E. Foley, at A–2, attached to defendants' Joint Motion for Summary Judgment. *See also, e. g., Emery & Co. v. B. & M.R.R.,* 47 I.C.C. 200 (1917), *Fabricas Auto-Mex., S.A. v. N.Y. Central Railroad Co.,* 332 I.C.C. 1 (1967).

19. *See* p. 3, *supra.*

20. Tr. of Hearing, January 20, 1976, at 62; Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Summary Judgment at 16.

Orders are interpretations and clarifications which did not alter or substantively change the meaning of the earlier Report and Order in Ex Parte No. 267. Rather, they represent an attempt by the Commission to clarify or more clearly define what was meant by the term "export-import" in that Report and Order. These subsequent Orders of August 6, 1973 and October 5, 1973 served to remove an apparent ambiguity and to correct the railroads' erroneous interpretation as to the rate increases authorized for all-rail traffic moving to and from Canada and Eastern Territory of the United States. Since the Orders were interpretations and clarifications, they were exempt from the Administrative Procedure Act's notice and hearing requirements of Section 553(b)(A). *Pan American Petroleum Corp. v. Federal Power Commission*, 116 U.S.App. D.C. 249, 322 F.2d 999 (1963). Therefore, the X–267–B Master Tariff in publishing increases of 14 percent on all rail export-import traffic violated the Commission's Order in Ex Parte No. 267, and all subsequent individual commodity tariffs providing for 14 percent increases in reliance on Ex Parte No. 267 continue to be in violation of the Commission's Orders issued in that proceeding.

### IV. *The Contention of the Eastern Railroads*

The Court turns next to the issue raised by the Eastern railroads in answer to the counterclaims, that is, whether the individual commodity tariffs incorporating 14 percent increases on all-rail export-import traffic were new rates, published in accordance with Commission procedures and independent of the Ex Parte No. 267 Orders.

Section 6 of the Interstate Commerce Act prohibits the filing of any tariffs on less than thirty days notice but permits the Commission in its discretion to allow the

railroads to file on less than thirty days notice.[21] In this case the Commission allowed the railroads to file Master Tariff X–267–B on fifteen days notice. That Master Tariff provided for 14 percent increases in rates between eastern Canada and the Northeastern part of the United States—increases in excess of the import-export rate authorized by Ex Parte No. 267.

It is not disputed that the first increases were taken pursuant to the general revenue proceeding through Master Tariff X–267–B, effective April 12, 1971. In its Report and Order in the Ex Parte No. 267 proceeding, the Commission admonished the railroads to update their individual tariffs. " . . . we find that no further complication of freight tariffs should be permitted until those in current use are updated sufficiently to enable shippers and carriers to ascertain the applicable rates and charges with certainty and without unreasonable difficulty. We will expect the respondents to take prompt action to update their tariffs at least to and including the Ex Parte No. 259 level, and *we announce herewith* that, in the absence of overwhelming emergency, we will not entertain petitions for special permission to depart from tariff filing requirements until we are satisfied that adequate progress has been made in eliminating the need for reference to numerous past general increases in the ascertainment of freight rates." 339 I.C.C. at 137.

The railroads began the process of updating individual commodity tariffs on May 12, 1971 and completed that process, including the thirty day Section 6 notice, prior to the entry of the Commission Orders challenged herein.

The Eastern Railroads claim that Ex Parte No. 267 permitted the 14 percent increases,[22] but contend that even if such increases were not permitted by Ex Parte

21. *See* note 8, *supra.*

22. Eastern railroads are of the view that the Ex Parte No. 267 Order permitted a 14 percent increase. Unlike the Canadian railroads, however, they have not advanced arguments with respect to that position. Tr. of Hearing, January 20, 1976, at 84. Memorandum of Points and Authorities of Additional Defendants to Counterclaims in Support of Their Motion for Summary Judgment on the Counterclaims and In Opposition to Defendants' Motions for Summary Judgment, at 16.

No. 267, that Order excused compliance with Section 6 notice requirements only for 12 percent increases. Therefore, they argue, even if the X–267–B Master Tariff 14 percent increases exceeded the Commission's authorization, they would be unlawful only because they were published without complying with the Section 6 notice requirements. Eastern railroads further contend that the individual commodity rate tariffs filed prior to the Commission's orders of August 6, and October 5, 1973 and in compliance with Section 6, extinguished the past Section 6 violation and were new rates independent of Ex Parte No. 267 Orders. Defendants and defendant-intervenor Alcan assert that the commodity tariffs simply incorporated and carried forward the X–267–B Master Tariff excessive increases. The short answer to the Eastern railroads' ingenious argument is that if these tariffs actually were meant to publish new rates, the Eastern railroads failed to properly identify them as such by using the appropriate symbols,[23] or in any other way indicating to the Commission or the shipping public the true nature of the rate change so as to permit them meaningful opportunity to examine and oppose the proposed rates before they become effective.

Eastern railroads rely on *Chicago M., St. P. & P. R. Co. v. Alouett Peat Products*, 253 F.2d 449 (9th Cir. 1958) as authority for their position. The *Alouette* case involved a challenge to individual tariff rates taken in excess of those authorized in a general revenue proceeding. The Commission dismissed the complaints, even though it found that the tariffs had been published on less than statutory notice and that no authorization for less than statutory notice had been granted. The Court reversed the Commission holding that the excessive rates had not been lawfully established because they had been published on less than statutory notice and that such a rate "[could] not be the valid, lawful rate even though it [became] the applicable rate by virtue of being on file with the Commission." *Chicago M., St. P. & P. Co. v. Alouette Peat Products, supra* at 455. This axe cuts both ways.

 Adopting the rationale of the *Alouette* case, we conclude that the Master Tariff 14 percent increases taken pursuant to Ex Parte No. 267, which this Court has found were in excess of the level authorized therein for export-import traffic, were published on less than statutory notice and were unlawful. The individual commodity tariffs published thereafter, having satisfied the publication requirements of Section 6 became the legal [24] applicable rates which shippers were required to pay. However, this process did not, under the circumstances herein, make them "new" rates.

The complexity of individual commodity tariffs, particularly at the time of the Ex Parte No. 267 proceedings, and the process of updating, whether by the filing of reissues, or the issuance of supplements or conversions, make apparent the necessity and importance of suing symbols, or some other notation to fairly give notice as to the nature of the tariff updating or change that is taking place. In filing their individual commodity tariffs, the Eastern railroads did not use the diamond-shaped "rate increase" symbol, but rather used the triangle-shaped "no change" symbol. Thus, the symbol indicated a continuance of the old rate rather than a new rate. The railroads also made use of some short-cut or special permission procedures, which lends further support to the contention that the individual commodity tariffs were merely republishing increases already in effect.[25] And despite the rather lengthy administrative history of

---

**23.** 49 C.R.F. § 1300.2(a)(1) provides in pertinent part: "[a]ll tariff publications and supplements thereto must indicate changes thereby made in existing rates or charges . . . by the use of the following uniform symbols in connection with such changes:

[teardrop shape] to indicate reductions.
[diamond shape] to denote increases.

[triangle shape] to denote changes in wording which result in neither increases nor reductions in charges."

**24.** The "legal" rate may nevertheless be challenged. *See* note 9, *supra*.

**25.** Affidavit of Martin E. Foley, at A–5 through A–7, attached to defendants' Joint Motion for Summary Judgment.

this controversy, the record indicates the Eastern railroads did not raise the claim that their 14 percent increases on commodities were new rates prior to the Commission's October 5, 1973 Order.

Eastern railroads point out that the Commission did not exercise its Section 15(7) suspension powers to prevent the individual commodity tariffs from becoming effective. But, whether higher or lower than the authorized level, the tariffs are still subject to challenge under Section 13 or 15. *Aberdeen & Rockfish R. Co. v. SCRAP*, 422 U.S. 289, 95 S.Ct. 2336, 45 L.Ed.2d 191 (1975); *United States v. Louisiana*, 290 U.S. 70, 54 S.Ct. 28, 78 L.Ed. 181 (1933). However, it must be recognized that it is unlikely and improbable that either the Commission or the shipping public would challenge a rate if it had been published without customary proper notice as to the nature of the rate, *i. e.*, whether it was a new rate or an unchanged rate. Furthermore, broad discretion in the exercise of the Commission's power of suspension has clearly been upheld and "judicial review of suspension action or inaction is most severely limited, if not foreclosed." *Aberdeen & Rockfish R. Co. v. SCRAP*, 409 U.S. 1207, 1208, 93 S.Ct. 1, 2, 34 L.Ed.2d 21 (1972).

◼ The 14 percent individual commodity tariff increases on all-rail traffic between Canada and Eastern Territory were taken by Eastern railroads through Master Tariff X–267–B in reliance on authority claimed to have been granted in Ex Parte No. 267. The increases were published in a manner that effectively precluded knowledge by the Commission and the shipping public as to their true nature. Under the circumstances of this case the Commission's Order of August 6, 1973, interpreting and clarifying the term "export traffic" as used in Ex Parte No. 267, and its Order of October 5, 1973, ordering the Eastern railroads to cease and desist from charging rates on "export-import" traffic in excess of the 12 percent rate authorized in Ex Parte No. 267, and directing them to correct their tariffs accordingly, was not an abuse of discretion and was otherwise in accordance

with law. To hold otherwise would permit carriers to take excessive rate increases on particular traffic (export-import here) through publication of a Master Tariff and later to legitimatize such excessive increases merely by filing "updated" individual commodity tariffs and indicating by the use of the standard symbol that "no change" was being made. Actually, in such circumstances a change is being made in the rate over that specified in the prior individual commodity tariff and the use of the "no change" symbol masks that change. Whether, intentional or unintentional, such procedure does not serve as fair notice of what is actually being done and cannot serve as a basis for a *de novo* legitimation of the rate set in the Master Tariff as contended herein by the Eastern railroads.

### V. Conclusion

◼ An Order of the Commission is presumed to be valid. *Pacific Fruit Express Company v. Akron, Canton & Youngstown R. Co.*, 355 F.Supp. 700, 707 (N.D.Cal.1973). This Court has found that the Orders at issue herein were "interpretations and clarifications" of the earlier Report and Order in Ex Parte No. 267; that the individual commodity tariff increases published by Eastern railroads were not new rates, but were taken pursuant to Ex Parte No. 267; and that increases in excess of 12 percent on all-rail traffic moving between Canada and Eastern Territory taken through Ex Parte No. 267 are in violation of the Orders entered in that general revenue proceeding. We conclude that the Commission's valid Orders should not be permitted to remain unenforced.

On the record in this case this Court finds and concludes that the Commission's Orders of August 6, 1973 and October 5, 1973, are not an abuse of discretion; are not arbitrary and capricious; were regularly made and duly served; and are otherwise in accordance with law. Accordingly, there is no genuine issue of any material fact, and the defendants, the United States and the Interstate Commerce Commission, and defendant-intervenor, Aluminum Company of

Canada, Ltd., are entitled to judgment on their counterclaims for enforcement as a matter of law pursuant to Section 16(12) of Title 49 United States Code. The motions of the plaintiffs and the additional parties defendant to the counterclaim for summary judgment should be denied.

This memorandum constitutes the findings and conclusions of the Court to the extent that such findings and conclusions may be necessary.

All concur.