648 F.2d 315
 16 ERC 1203
 MERCURY MOTOR EXPRESS, INC. and American Trucking
Associations, Inc., Petitioners,
v.
UNITED STATES of America and Interstate Commerce Commission,
Respondents.
EAST TEXAS MOTOR FREIGHT SYSTEM and the Regular Common
Carrier Conference of the American Trucking
Associations, Inc., Petitioners,
v.
UNITED STATES of America and Interstate Commerce Commission,
Respondents.
 Nos. 79-1052, 79-1121.
 United States Court of Appeals,
Fifth Circuit.
 June 18, 1981.
 
 Alan J. Thiemann, Nelson J. Cooney, Kenneth E. Siegel, Robert A. Hirsch (on the brief), Washington, D.C., for petitioner American Trucking Associations, Inc.
 J. Raymond Chesney, Dallas, Tex., for East Motor Freight System.
 Edward K. Wheeler, Keith G. O'Brien, Washington, D.C., for intervenors International Broth. of Teamsters et al.
 Wm. H. Shawn, Leonard A. Jaskiewicz (on the brief), Washington, D.C., Harold R. Ainsworth, New Orleans, La., for intervenor Common Carrier Conference.
 Christine A. Meagher, Keller & Heckman, William H. Borghesani, Jr., Michael F. Morrone, Joseph E. Keller, Washington, D.C., for intervenor Private Carrier Conference, Inc.
 Gary Dunbar, Alan J. Thiemann, Washington, D.C., Bamford, Rice, Carpenter & Carraway, Roland Rice and Wm. H. Shawn, Arlington, Va., for Regular Common Carrier Conference, etc.
 Sanford M. Litvack, Asst. Atty. Gen., Richard A. Allen, Robert B. Nicholson, Asst. Chief, Nancy Garrison, Atty., Griffin B. Bell, Atty. Gen., U. S. Dept. of Justice, James P. Tuite, Lawrence H. Richmond, ICC, Washington, D.C., for respondents.
 
 
 1
 Petitions for Review of an Order of the Interstate Commerce Commission.
 
 
 2
 Before KRAVITCH and THOMAS A. CLARK, Circuit Judges, and LYNNE,* District Judge.
 
 LYNNE, District Judge:
 
 3
 The genesis of this litigation, including the two consolidated petitions under submission, was the publication by the Interstate Commerce Commission (Commission) of a notice in the Federal Register.[1] In response to such notice some thirty-nine comments were received from carriers,[2] shippers, labor, and government parties.[3] After discussing and evaluating such comments, the Commission served its order in Ex Parte No. MC-118 on November 20, 1978.[4] By publication in the Federal Register on February 5, 1979 (44 Fed.Reg. 7030-31), the Commission established accounting and reporting requirements for private carriers granted operating authority pursuant to Ex Parte No. MC-118. On April 24, 1979, a petition to reopen proceedings in Ex Parte No. MC-118 was filed with the Commission and thereafter denied by its order of October 4, 1979.
 
 
 4
 Petitioners[5] seek to review, enjoin, and set aside these orders. After a careful review of the record, the briefs and oral arguments of counsel, we deny the petitions for review.I. The Act
 
 
 5
 The Motor Carrier Act of 1935[6] created a regulatory framework contemplating three kinds of motor carrier operations: common, 49 U.S.C. § 10102(11); contract, 49 U.S.C. § 10102(12); and private, 49 U.S.C. § 10102(13). Within the scope of its operating authority, evidenced by its certificate, a common carrier offers transportation services to the general public. In contrast, a contract carrier has no obligation to serve the general public, serves only a limited number of persons, and either dedicates equipment to the exclusive use of those persons or provides service which meets their particularized needs. Its rights and obligations are generally defined by the scope of its operating authorities, evidenced by its permits. The Commission is empowered to enforce the statutory requirements applicable to each. 49 U.S.C. §§ 10321, 11701.
 
 
 6
 On the other hand, a private carrier is exempt from the Commission's regulation. It may perform any transportation service, so long as it hauls only its own goods in furtherance of its nontransportation business.
 
 
 7
 There is no explicit provision in the Act that these three categories of carriers are mutually exclusive nor is there any proscription of for-hire operations by private carriers.
 
 
 8
 The genius of the Act is its entrustment to a Commission, informed by many years of experience in the multifaceted transportation industry, the administration and enforcement of the national transportation policy declared in 49 U.S.C. § 10101.
 
 II. From Geraci to Toto
 
 9
 More than forty years ago the Commission decided Geraci Contract Application, 7 M.C.C. 369 (1938), wherein it denied incidental contract carrier authority to a private carrier because it reasoned that such a grant would be contrary to the public interest and inconsistent with the national transportation policy.[7] While it discussed practical problems which might be encountered were such incidental authority granted, it is apparent that its primary concern was its desire to protect the interests of regulated carriers in the fledgling transportation industry.
 
 
 10
 Since 1938, relying on Geraci, the Commission has normally denied private carrier applications for incidental for-hire authority.[8] Notwithstanding its usual adherence to Geraci, the Commission has occasionally granted for-hire authority to private carriers, implicitly finding that such grants were not inconsistent with the Act. For example, it has granted private carriers for-hire authority when the applicant conducted its for-hire operations during the "grandfather" period prior to the enactment of the Motor Carrier Act,[9] when the applicant was not seeking to fill a backhaul,[10] when the private carriers' vehicles were used only during half the year,[11] when the private carrier operations were incidental to the for-hire operations,[12] and when it found that a grant would not create competition with for-hire carriers.[13]
 
 
 11
 In 1976, separate license applications were filed by two companies using their own trucks to move their own goods.[14] Toto, a Nevada building materials wholesaler and retailer, used its own trucks to carry building materials from its suppliers in California to its warehouse in Nevada. As a private carrier, Toto had to run its flat-bed trucks empty from Nevada to California, because it had nothing of its own to move in that direction. In an effort to eliminate the wasteful empty movement to California, it found two shippers in Nevada desirous of moving freight to California who were unable to get enough flat-bed equipment from existing carriers. It applied for a common carrier certificate from the Commission.
 
 
 12
 Avon, the other company to file a license application, moved its products in private carriage from its Massachusetts facilities. Because it had no goods of its own to move back to Massachusetts, its trucks had to make the return trip empty. It found a shipper who needed traffic moved in the same direction as its empty backhaul and applied for a contract carrier permit to transport bulk crackers from Georgia to Massachusetts.
 
 
 13
 In separate decisions, employee review boards at the Commission denied both applications on the basis of Geraci. On administrative appeal, the entire Commission reexamined Geraci, overruled it, and granted the applications in Toto, 128 M.C.C. 873 (1978). From this decision the MC-118 policy statement proceeding developed.
 
 
 14
 Petitioner's complaint that in both Toto and MC-118 the Commission merely regurgitated the dissenting opinion of then Commissioner O'Neal in Geraci is unappealing since it is a familiar phenomenon in our jurisprudence that the dissent of yesterday sometimes becomes the ratio decidendi of today. Rather, the focus of our review is upon their contentions that the new policy announced in MC-118, which evolved from its Toto decision, is both illegal and irrational.
 
 III. Rule or Policy
 
 15
 Insofar as the notice-and-comment requirements of 5 U.S.C. § 553 are concerned, it is immaterial whether the pronouncement appearing in Note 1, supra, is characterized as a rule, on the one hand, or as a general statement of policy, on the other, since there was full compliance with the requirements of Sec. 553.[15] In response to questions from the bench, however, it was argued that such policy statement constituted rule making and was unlawful because it was unsupported by substantial evidence.[16]
 
 
 16
 We do not labor the sometimes elusive distinction between a rule as defined in 5 U.S.C. 551(4)[17] and a policy statement which we defined in Brown Express, Inc. v. United States, 607 F.2d 695 (5th Cir. 1979) as:
 
 
 17
 an announcement to the public of the policy which the agency hopes to implement in future rulemakings or adjudications. A general statement of policy, like a press release, presages an upcoming rulemaking or announces the course which the agency intends to follow in future adjudications.[18]
 
 
 18
 We agree with the Commission that "the challenged pronouncement is a policy statement rather than a new rule (and that our review is limited to ascertaining whether the Commission's action was 'arbitrary, capricious, (or) an abuse of discretion'), 5 U.S.C. § 706(2)(A)."[19]
 
 
 19
 To imprison the Commission in a policy formulated more than forty years ago when the transportation industry was in its infancy would effectively thwart its proper enforcement of the National Transportation Policy. To the contrary, it has been directed to administer the Act in light of the nation's changing needs:
 
 
 20
 (T)he Commission, faced with new developments or in light of reconsideration of the relevant facts and its mandate, may alter its past interpretation and overturn past administrative rulings and practice In fact, this kind of flexibility and adaptability to changing needs and patterns of transportation is an essential part of the office of a regulatory agency. Regulatory agencies do not establish rules of conduct to last forever; they are supposed, within the limits of the law and of fair and prudent administration, to adapt their rules and practices to the Nation's needs in a volatile, changing economy. They are neither required nor supposed to regulate the present and future within the inflexible limits of yesterday.
 
 
 21
 American Trucking Associations v. Atchison, T. & S. F. Ry., 387 U.S. 397, 416, 87 S.Ct. 1608, 1618, 18 L.Ed.2d 847 (1967).
 
 
 22
 The Commission justifies its abandonment of the Geraci and adoption of the Toto policy by considering and documenting the dynamic expansion of the motor carrier industry in the intervening years.[20] The dramatic changes which have taken place within the area of its ongoing regulation have persuaded the Commission that its former protectionist attitude toward the financial stability of the regulated carriers is no longer consistent with the national interest.
 
 
 23
 The Commission's sensitivity to the imperativeness of energy conservation is apparent from its consideration of increasing and wasteful empty backhauls experienced by private carriers.[21] We cannot fault its conclusion that "(t)he increasing need for energy-efficient operations has caused the Commission to place added emphasis on coordination between the various forms of transportation, public and private."[22]
 
 
 24
 We hold that the MC-118 policy is consistent with the Interstate Commerce Act[23] and is rational on its face. It merely advises the public that it intends to entertain applications for operating authority from firms engaged in private carriage. Of course new problems will arise to test severely its expertise. But the litany of potential abuses to which petitioners advert can largely be avoided by reliance on the application process and enforcement proceedings.
 
 
 25
 IV. Environmental and Energy Impact Statements
 
 
 26
 It is insisted that by failing to prepare environmental and energy impact statements, the Commission has violated the National Environmental Policy Act of 1969,[24] 42 U.S.C. § 4332(2)(C), the Energy Policy and Conservation Act of 1975, 42 U.S.C. § 6362, and its own regulations. In its discussion and conclusions in MC-118, the Commission explicitly found: "This decision is not a major Federal action significantly affecting the quality of the human environment within the meaning of the National Environmental Policy Act of 1969, and is not a major regulatory action under the Energy Policy and Conservation Act of 1975."[25]
 
 
 27
 We are in accord with the reasoning of Assure Competitive Transportation, Inc. v. United States, 635 F.2d 1301 (7th Cir. 1970), in a strikingly parallel proceeding, and hold that it is neither. Since otherwise it was neither arbitrary, capricious nor an abuse of discretion, the Commission's determination that such statements need not be filed must stand. Hanley v. Kleindienst, 471 F.2d 823 (2d Cir. 1972), cert. denied, 412 U.S. 908, 93 S.Ct. 2290, 36 L.Ed.2d 974 (1973).
 
 V. Accounting and Reporting
 
 28
 By publication in the Federal Register on February 5, 1979 (44 Fed.Reg. 7030-31), the Commission subsequently established accounting and reporting requirements for private carriers granted operating authority pursuant to Ex Parte No. MC-118. That notice was issued without public participation. However, it was not etched in granite. As explained therein, the Commission divides for-hire motor carriers into three classes for accounting and reporting purposes. It places a new carrier into one of these categories by making a reasonable estimate of its future annual operating revenue. Because applicants under the MC-118 policy have had no track record, it determined that to begin with it will place these carriers in the lowest class (Class III), the class for licensed carriers with annual carrier revenues of less than $500,000. After a year of operation, it will follow its standard practice of evaluating the carrier's financial report and reclassifying it if its revenues from for-hire operations exceed $500,000.[26]
 
 
 29
 Petitioners in 79-1121 argue that the Commission impermissibly issued this statement without prior Notice and Comment pursuant to 5 U.S.C. § 553. We disagree. The Administrative Procedure Act exempts "interpretive rules, general statements of policy (and) rules of agency organization, procedure or practice" from Notice and Comment requirements. 5 U.S.C. § 553(b)(A). The notice of which Petitioners complain merely clarifies and explains how the Commission's accounting rules will apply to newly authorized carriers under the general MC-118 policy. As an interpretive statement it is exempt from Notice and Comment requirements. See Brown Express, Inc. v. United States, 607 F.2d 695 (5th Cir. 1979); Shell Oil Co. v. FNC, 491 F.2d 82 (5th Cir. 1974); Canadian National Ry. v. United States, 425 F.Supp. 290 (D.C. Cir. 1976).
 
 
 30
 The petitions for review are DENIED.
 
 
 
 *
 District Judge of the Northern District of Alabama, sitting by designation
 
 
 [1]
 (7035-01)
 INTERSTATE COMMERCE COMMISSION (49 CFR Part 1040) (Ex Parte No. MC 118).
 GRANT OF MOTOR CARRIER OPERATING AUTHORITY TO AN APPLICANT WHO INTENDS TO USE IT PRIMARILY AS AN INCIDENT TO THE CARRIAGE OF ITS OWN GOODS AND ITS OWN NONTRANSPORTATION BUSINESS
 Proposed Policy Change
 AGENCY: Interstate Commerce Commission.
 ACTION: Proposed policy change.
 SUMMARY: The purpose of this document is to institute a proceeding to determine whether the Commission should change, in accordance with its recent decision in Toto Purchasing & Supply Co., Inc., 128 M.C.C. 873 (1978), its policy regarding the issuance of for-hire motor carrier operating authority to private carrier applicants.
 DATES: Comments must be received on or before September 18, 1978.
 
 
 [43]
 Fed.Reg. 149 (1978)
 
 
 [2]
 The carriers, with the single exception of The Private Carrier Conference, intervening in support of Respondents, vigorously disagreed with the result reached in Toto Purch. & Supp. Co., Inc., 128 M.C.C. 873 (1978)
 
 
 [3]
 The shipper parties, the United States Department of Transportation and the Council of Wage and Price Stability espoused Toto
 
 
 [4]
 The thrust of its order was summarized by the Commission as follows: "The Commission here affirms the policy announced in Toto Purchasing & Supply Co., Inc., 128 M.C.C. 873 (1978), that for-hire operating authority can be granted to an applicant who intends to use it primarily as an incident to the carriage of its own goods and its own transportation business, provided (1) that the standard criteria for motor common carrier applications or motor contract carrier applications, as the case may be, are met, and (2) that the applicant is agreeable to the imposition of conditions requiring it to conduct its for-hire motor carrier activities and its other activities independently and to maintain separate records for each."
 
 
 [5]
 Petitioners are Mercury Motor Express, Inc., American Trucking Associations, Inc., East Texas Motor Freight System, and The Regular Common Carrier Conference, Inc. Intervening Petitioners, Common Carrier Conference Irregular Route, Inc., and International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America
 
 
 [6]
 All sections referred to herein appear in Title 49, Revised Interstate Commerce Act
 
 
 [7]
 While Geraci involved an application for incidental contract carrier authority, the Commission extended the same general prohibition to applications for common carrier authority in Bales Com. Car. Applic., 9 M.C.C. 7 (1938)
 
 
 [8]
 See, e. g., Adams Egg Farms, Inc., Contr. Car. Applic., 95 M.C.C. 282 (1964); Argo Truck Co., Inc., Exten. Salt, 96 M.C.C. 434 (1963); Taylor & Lambert Exten. Ill., 92 M.C.C. 783 (1963); Derrico Co., Inc., Contr. Car. Applic., 88 M.C.C. 17 (1961); St. Louis Solv. & Chem. Co. Contr. Car. Applic., 82 M.C.C. 253 (1960); Davidson Exten. Spec. Commods., 51 M.C.C. 401 (1950); Hardman Contr. Car. Applic., 48 M.C.C. 715 (1948); Romine Creamery Co. Contr. Car. Applic., 7 M.C.C. 569 (1938)
 
 
 [9]
 See Thomas W. Watkins & Son, Inc., Com. Car. Applic., 41 M.C.C. 564 (1942); Buzby Contr. Car. Applic., 33 M.C.C. 226 (1942); Villaume Contr. Car. Applic., 30 M.C.C. 92 (1941); Southern Utah Produce Co. Com. Car. Applic., 29 M.C.C. 767 (1941); Gill Exten. Oprs., 26 M.C.C. 593 (1940); Chas. Maronna & Co., Inc. Com. Car. Applic., 26 M.C.C. 281 (1940); H. V. Grantham & Sons Exten. Opers., 20 M.C.C. 457 (1939); Bowar Bros., Inc., Contr. Car. Applic., 11 M.C.C. 123 (1939)
 
 
 [10]
 Garrison Elev'r Co., Exten. Fert. in Bulk, 69 M.C.C. 99 (1956); James Gibbins Co. Contr. Car. Applic., 31 M.C.C. 635 (1942); W. P. Ross & Sons Contr. Car. Applic., 31 M.C.C. 473 (1941); Biddison Contr. Car. Applic., 28 M.C.C. 205, 211 (1940); Brooks-Gillespie Motors, Inc., Com. Car. Applic., 14 M.C.C. 631 (1939)
 
 
 [11]
 Good Roads Co., Contr. Car. Applic., 10 M.C.C. 183 (1938)
 
 
 [12]
 Redland Oil Co., Contr. Car. Applic., 91 M.C.C. 771, 776 (1963); Dohrman Com. Car. Applic., 31 M.C.C. 680, 682 (1941)
 
 
 [13]
 Wood Com. Car. Applic., 10 M.C.C. 389 (1938). See also Northwestern-Malden Barrel Co., Contr. Car. Applic., 83 M.C.C. 705, 709 (1960); Moyer Com. Car. Applic., 83 M.C.C. 83 (1960); Fuller Contr. Car. Applic., 73 M.C.C. 716, 717-18 (1957); Zimmerman Contr. Car. Applic., 27 M.C.C. 650 (1941); Zeisloft Com. Car. Applic., 12 M.C.C. 13 (1938)
 
 
 [14]
 Toto Purchasing & Supply Co., Inc., and Avon Corrugated Corporation
 
 
 [15]
 See Bonney Motor Exp., Inc. v. United States, 640 F.2d 646 (5th Cir. 1981)
 
 
 [16]
 See 5 U.S.C. § 706(2)(E)
 
 
 [17]
 (4) "rule" means the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency and includes the approval or prescription for the future of rates, wages, corporate or financial structures or reorganizations thereof, prices, facilities, appliances, services or allowances thereof or of valuations, costs, or accounting, or practices bearing on any of the foregoing
 
 
 [18]
 607 F.2d at 701, quoting Pacific Gas & Elec. Co. v. FPC, 506 F.2d 33, 38 (D.C. Cir. 1974)
 
 
 [19]
 We borrow the peculiarly applicable quoted language from the opinion in Assure Comp. Transp. v. United States, 635 F.2d 1301, 1307 (7th Cir. 1980). Therein the court was dealing with a commission policy statement which prospectively modified the traditional criteria used by it in deciding whether to grant an application for a certificate of public convenience and necessity under 49 U.S.C. § 10922 by eliminating the second of the three criteria announced by it in Pan-American Bus Lines Operation, 1 M.C.C. 190 at 203 (1936)
 
 
 [20]
 In 1978, there were 16,874 motor carriers operating under authority issued by the Commission (1978), I.C.C. 92nd Ann.Rep., App. E at 132. Regulated motor carriers earned 67.3 billion in 1978. Transportation Association of America, Transportation Facts and Trends, Quarterly Supplement, p. 3 (April 1979). Estimates place the number of private carriers between 113,000 and 150,000
 
 
 [21]
 A study conducted by the Commission shows that approximately 27.3 percent of private carrier mileage is empty, compared to 16.2 percent for regulated carriers. Interstate Commerce Commission, Empty/Loaded Truck Miles on Interstate Highways During 1976 (April 1977)
 
 
 [22]
 Ex Parte No. MC-118 at 5 (Nov. 20, 1978)
 
 
 [23]
 We reject out of hand the argument that the Commission has created a new and hybrid category of carriers. It adds no competition to the transportation market
 
 
 [24]
 We assume, arguendo, that petitioners and intervenors have standing to assert their challenge on environmental grounds
 
 
 [25]
 Ex Parte No. MC-118 at 11 (Nov. 20, 1978)
 
 
 [26]
 See 49 C.F.R. 1240.5 (1980)