716 F.2d 1369
 RYDER TRUCK LINES, INC., Petitioner,
v.
UNITED STATES of America and Interstate Commerce Commission,
Respondents.
BOWMAN TRANSPORTATION, INC., et al., Petitioners,
v.
UNITED STATES of America, and The Interstate Commerce
Commission, Respondents.
 Nos. 82-5247, 82-8133.
 United States Court of Appeals,
Eleventh Circuit.
 Oct. 11, 1983.
 
 Rice, Carpenter & Carraway, John Bradley, Robert C. Bamford, Arlington, Va., for petitioner.
 
 
 1
 William H. Borghesani, Jr., Keller & Heckman, Michael F. Marrone, Jonathan P. Levine, Washington, D.C., for intervenors F/Nat. Amer. Wheels Grocers Ass'n.
 
 
 2
 Robert B. Nicholson, Kenneth P. Kolson, Dept. of Justice, Washington, D.C., for Private Truck Council of America, Inc.
 
 
 3
 Charles Ephraim, Washington, D.C., for Bowman Transp. Inc.
 
 
 4
 Rea, Cross, Auchincloss, Donald E. Cross, Washington, D.C., for intervenor Steel Carriers' Tariff Assoc., Inc.
 
 
 5
 Lawrence H. Richmond, U.S. Dept. of Justice, Chief Appellate Section, Kenneth P. Kolson, Dept. of Justice, Robert B. Nicholson, Washington, D.C., for I.C.C.
 
 
 6
 Steptoe & Johnson, Robert J. Corber, Washington, D.C., for intervenor The American Movers Conference.
 
 
 7
 Doherty & Munson, James M. Doherty, Austin, Tex., for intervenor J.H. Rose Truck Line, Inc., and Frank Bros. Trucking Co.
 
 
 8
 Donelan, Cleary, Wood & Maser, John F. Donelan, Frederic L. Wood, John F. Donelan, Jr., Washington, D.C., for intervenor The Nat. Indus. Traffic League.
 
 
 9
 Charles D. Gray, Asst. Gen. Counsel, Washington, D.C., for intervenor Nat. Assoc. of Regulatory Utility Com'rs.
 
 
 10
 William P. Jackson, Jr., Arlington, Va., for intervenor Charter Exp., Inc., et al.
 
 
 11
 Bregman, Abell & Kay, David Simon, Washington, D.C., for intervenor Truck Renting & Leasing Assoc.
 
 
 12
 Wheeler & Wheeler, Keith G. O'Brien, Washington, D.C., for intervenor Intern. Broth. of Teamsters, Chauffeurs, Warehousemen & Helpers of America.
 
 
 13
 Billig, Sher & Jones, Jacob P. Billig, Terrence D. Jones, Jeffrey F. Lawrence, Washington, D.C., for intervenor The Private Truck Council of America, Inc.
 
 
 14
 Keller & Heckman, William H. Borghesani, Jr., Michael F. Morrone, Jonathan P. Levine, Washington, D.C., for intervenor The Nat. American Wholesale Grocers' Ass'n and The Private Carrier Conference, Inc.
 
 
 15
 Petitions for Review of Orders of the Interstate Commerce Commission.
 
 
 16
 Before KRAVITCH, HENDERSON and ANDERSON, Circuit Judges.
 
 R. LANIER ANDERSON, Circuit Judge:
 
 17
 Petitioners[1] request that we set aside a policy statement issued by the Interstate Commerce Commission (ICC or Commission) in a proceeding formally entitled Ex Parte No. MC-122 (Sub-No. 2), Lease of Equipment and Drivers to Private Carriers (February 9, 1982). In essence, the ICC has announced a new formula for determining whether a particular transportation leasing arrangement constitutes "for-hire carriage," subject to ICC regulation, or "private carriage" exempt from such regulation. Because we conclude that a rational basis exists for the new formula proposed by the ICC, we deny the petitions.
 
 
 18
 I. The Regulation of "For-Hire" Carriage.
 
 
 19
 The Motor Carrier Act of 1935, 49 Stat. 543-67, 49 U.S.C.A. Sec. 10101, et seq. (West 1982 Pamphlet), subjects the provision of for-hire motor transportation to regulation by the ICC. The aim of the act generally is "to assure that shippers ... will be provided a healthy system of motor carriage to which they may resort to get their goods to market." United States v. Drum, 368 U.S. 370, 374, 82 S.Ct. 408, 410, 7 L.Ed.2d 360 (1962); see S.Doc. No. 152, 73rd Cong., 2d Sess. (1934); H.R.Doc. No. 89, 74th Cong., 1st Sess. (1935); H.R.Rep. No. 1645, 74th Cong., 1st Sess. (1935). In order to achieve this goal of a stable transportation industry, the Act provides for collective rate-making and erects stringent barriers to entry into the transportation industry to ensure the need for, and reliability of, those carriers authorized to engage in for-hire transportation. The Act also recognizes the need to allow a merchant to continue to transport its own goods "in furtherance of its non-transportation business." Mercury Motor Express, Inc. v. United States, 648 F.2d 315, 317 (5th Cir. June 18, 1981);[2] see S.Rep. No. 482, 74th Cong., 1st Sess. (1935); H.R.Rep. No. 1645, supra. The Act therefore regulates only "common" or "contract" carriers that engage in transportation for compensation or "for-hire carriage." See 49 U.S.C.A. Secs. 10102(11) & 10102(12). The Act specifically exempts from regulation private carriage. 49 U.S.C.A. Sec. 10102(13).
 
 
 20
 The original Motor Carrier Act, however, did not provide a substantive definition of private carriage, but rather defined private carriers as transporters of property who are neither common nor contract carriers. Thus, from the outset the ICC was entrusted with the responsibility of determining when the provision of transportation services constitutes exempt private carriage. Moreover, the ICC was required to define this exemption in a manner consistent with Congress' desire to protect shippers from the diversions of traffic that would result from an overly competitive transportation industry. See United States v. Drum, 368 U.S. at 374-76, 82 S.Ct. at 410-11. This policy of protecting the motor carrier industry, requiring stringent barriers to entry into the industry, led the ICC at an early date to scrutinize closely nominally private transportation arrangements. Of particular concern to the ICC was a practice known as "single-source leasing," in which the shipper leases both vehicle and driver from the same source. For example, when a shipper leases the vehicle and driving services of an owner/operator, the ICC must determine whether that owner/operator is engaging in transportation for compensation (for-hire carriage) or whether the shipper is legitimately engaged in procuring equipment and service necessary to engage in private carriage, incidental to its primary non-transportation business. A single-source arrangement potentially can be used to evade the ICC's regulatory authority.
 
 
 21
 In H.B. Church Truck Service Co. Common Carrier Application, 27 M.C.C. 191 (1940), overruled, 132 M.C.C. 758 (1982), the ICC recognized the possibility of subterfuge in single-source leasing and attempted to lay down a test to be used when determining whether such arrangements constitute private carriage. The Commission stated that "[e]ssentially the issue is as to who has the right to control, direct, and dominate the performance of the service." Id. at 195. If that right of control remained with the lessor, then the lessor would be engaged in for-hire carriage, and subject to ICC regulation. On the other hand, if the right to control, direct and dominate remained with the lessee (i.e., shipper), then the shipper would be engaged in exempt private carriage. Equally important, however, the Commission announced that a presumption of for-hire carriage would arise when the shipper leases both vehicle and driver from a single source, such as an owner/operator or a leasing agency. This presumption would yield "to a showing that the shipper has the exclusive right and privilege of directing and controlling the transportation service, as, for example, if the equipment were operated by the shipper's employee." Id. at 196. Finally, the determination necessary to rebut the presumption of for-hire carriage would be made in light of all facts and circumstances, none of which would be conclusive by itself.[3] Thus, the Church case formulated the "control" test for distinguishing private carriage from for-hire carriage, and created a rebuttable presumption of for-hire carriage when the shipper engages in single-source leasing.
 
 
 22
 In 1958, Congress, seeing the need to reinforce the Commission's efforts at preventing subterfuge and evasion of its authority, amended the Motor Carrier Act to clarify somewhat the definition of private carriage. This amendment provided that in order to constitute exempt private carriage it is necessary that:
 
 
 23
 (1) the property is transported by a person engaged in a business other than transportation; and
 
 
 24
 (2) the transportation is within the scope of, and furthers a primary business (other than transportation) of the person.
 
 
 25
 Pub.L. 85-626, 72 Stat. 574 (1958), codified at 49 U.S.C.A. Sec. 10524 (West 1982 pamphlet) (emphasis added); see H.R.Rep. No. 1922, 85th Cong., 2d Sess. (1958); S.Rep. No. 1647, 85th Cong., 2d Sess. (1958).[4]
 
 
 26
 Contemporaneously with the 1958 amendments, the Commission itself began to reformulate the control test it had announced in Church. Thus, in Pacific Diesel Rental Co.--Investigation of Operations, 78 M.C.C. 161 (1958), the Commission held that the control test required an answer to the following question: "Are any persons ... in substance engaged in the business of interstate or foreign transportation ... fore hire?" Id. at 172 (using both new formulation and older "control" test). This reformulation signaled a more searching inquiry that was to focus not only on the physical aspects of control and direction, but also on the financial arrangements existing between the lessor and the shipper.[5] This refinement reached its culmination in Oklahoma Furniture Manufacturing Co.--Investigation, Operations, 79 M.C.C. 403, 409-10 (1959), overruled, 132 M.C.C. 758 (1982), in which the Commission announced that the control test was a separate inquiry from that required in Pacific Diesel, and that Pacific Diesel in essence created a supplementary test of "substance." Under the Commission's new two-pronged test, in order to find that a particular arrangement constitutes private carriage, it would be necessary that no person other than the shipper had "any right to control, direct, and dominate" the transportation service and that no person was "in substance, engaged in the business of ... transportation of property ... for hire." 79 M.C.C. at 410. Moreover, the Commission stated that with regard to the first prong, the control test, "there is present, whenever the owner-operator drives his own equipment, the right and power of the lessor to defeat any supposed right to control that the shipper lessee may believe exists." Id. at 411 (emphasis added). As a result of this two-prong test, the exercise of physical control and domination by the shipper no longer would necessarily suffice to support a finding of private carriage. Rather, under the "substance" prong of the inquiry, the Commission would examine the financial relationship between the lessor and the shipper in an effort to determine whether the lessor was in effect providing a transportation service to the shipper.[6]
 
 
 27
 This new formulation by the Commission was expressly upheld by the United States Supreme Court in United States v. Drum, 368 U.S. 370, 82 S.Ct. 408, 7 L.Ed.2d 360 (1962). During the course of its opinion, the Supreme Court examined Commission case law and stated that the new two-prong test announced by the Commission was in reality "an explicit recognition [of] a premise which has long been implicit in [the Commission's] decisions: That some indicia of private carriage may be assumed, and detailed surveillance of operations undertaken, without a shipper's having significantly shouldered the burdens of transportation." 368 U.S. at 383-84, 82 S.Ct. at 414-15 (emphasis added). The court thus interpreted the Commission's examination of the financial relations between the parties as permissibly treating financial risks as a significant burden of transportation. Id. at 385, 82 S.Ct. at 415. To date, the Commission generally has followed the analysis set forth in United States v. Drum, and has examined not only the degree of control exercised by the shipper but also the financial obligations, liabilities, and risks allocated to each party. Further, the Commission has continued to rely on the presumptions announced in Church and Drum. See, e.g., All Points, Inc.--Investigation of Operations, 123 M.C.C. 242 (1975); Snyder's Wholesale Liquors, Inc., Petition, 113 M.C.C. 528 (1971); American Equipment Rental, Inc.--Investigation, 96 M.C.C. 383 (1964). Compare Ontario Co.--Declaratory Order, 112 M.C.C. 211 (1970); Rayette, Inc.--Investigation of Operations, 108 M.C.C. 410 (1969).
 
 II. The Policy Statement
 
 28
 The instant proceeding commenced on December 24, 1980, when the ICC made public a proposed policy statement, Ex Parte No. MC-122 (Sub-No. 2) Lease of Equipment and Drivers to Private Carriers, 132 M.C.C. 351, 45 Fed.Reg. 86766 (Dec. 31, 1980) (Notice of Proposed Policy Statement). The purpose of the proposal was "to consider whether, in light of the exempt nature of private carriage operations, [the Commission] should modify [the] current policy prohibiting persons who do not hold operating authority from this Commission (e.g., owner/operators) from leasing their equipment with drivers directly to private carriers for the performance of private carriage operations...." 132 M.C.C. at 352. Accordingly, the Commission solicited notice and comment from all interested parties, held a public hearing during the course of the proceeding, and issued its final policy statement on February 9, 1982. See Lease of Equipment and Drivers to Private Carriers, 32 M.C.C. 756 (1982), 47 Fed.Reg. 7885 (Feb. 23, 1982).[7]
 
 
 29
 The substance of this new policy was a reformulation of the criteria to be applied in determining whether a particular leasing arrangement constitutes private or for-hire carriage. Specifically, the Commission declared that no longer would it employ the presumption announced in Church that leases of equipment with drivers (single-source leases) ordinarily constitute for-hire transportation by the lessor. Further, the Commission rejected the presumption announced in Oklahoma Furniture and upheld in Drum that an owner/operator when driving his own equipment has the inherent right and power to defeat the shipper's ability to control, direct and dominate transportation. In addition to eliminating these presumptions, the Commission promulgated a list of factors that it will examine when determining whether exempt private carriage exists.[8] Further, the Commission announced a list of minimum requirements which if included in a lease between a shipper and an owner/operator would create a presumption that "the transportation being performed is private carriage controlled by the shipper." 132 M.C.C. at 778. According to the Commission, such a presumption could be rebutted by a showing that the actual operation of the lease arrangement indicated an absence of the degree of control and responsibility required of the shipper.[9]
 
 
 30
 The policy statement makes clear, however, that the Commission will not rely upon any precise formula or list of criteria, or:
 
 
 31
 restrict [its] inquiry to the formal recitals of the lease agreement, but will--as in the past--examine all surrounding facts and circumstances and the actual conduct of operations under the lease to ascertain if the true substance of the arrangement is in accord with that recited in the formal agreement."
 
 Id. at 776.[10]
 
 32
 On March 4, 1982, parties in opposition to the policy statement petitioned the Commission for a stay of its order pending judicial review. This petition was denied on March 18, and a petition for judicial review of the Commission's policy statement was duly filed in this court.
 
 
 33
 Although the great number of petitioners has resulted in an even greater number of issues, petitioners' essential contentions are as follows: (1) the Commission improperly proceeded by way of a general statement of policy rather than through rule-making; (2) the proposed changes are beyond the Commission's statutory authority; (3) the change in policy is arbitrary, capricious, or an abuse of discretion; and (4) the Commission failed to abide by the requirements of the National Environmental Policy Act (NEPA), 42 U.S.C.A. Sec. 4321, et seq. (West 1977), and the Energy Policy and Conservation Act (EPCA), 42 U.S.C.A. Sec. 6201, et seq. (West 1977). Each of these contentions will be discussed in turn.
 
 III. Policy Statement or Rule-Making
 
 34
 Petitioners first argue that because of the far reaching and binding effect which the policy statement will have on future adjudication the Commission acted improperly in proceeding by way of a general statement of policy rather than through a rule-making procedure in accordance with the requirements of Sec. 4 of the Administrative Procedure Act, 5 U.S.C.A. Sec. 553 (West 1977).[11]
 
 
 35
 Petitioners concede that though this proceeding was labeled a "proposed policy statement," the Commission complied with the notice and comment requirements of Sec. 4. Nonetheless, in order to determine the relevant standard of review, see 5 U.S.C.A. Sec. 706(2) (West 1977), we must determine whether the Commission's action was properly denominated a general statement of policy. Although making this determination is often "akin to wandering lost in the Serbonian bog," Jean v. Nelson, 711 F.2d 1455 (11th Cir.1983), reh'g granted, 714 F.2d 96 (1983), "enshrouded in considerable smog," Noel v. Chapman, 508 F.2d 1023, 1030 (2d Cir.), cert. denied, 423 U.S. 824, 96 S.Ct. 37, 46 L.Ed.2d 40 (1975), the question need not detain us long.
 
 
 36
 Generally, whether a particular agency proceeding announces a rule or a general policy statement depends upon whether the agency action establishes "a binding norm." Guardian Federal Savings and Loan Association v. Federal Savings and Loan Insurance Corp., 589 F.2d 658, 666 (D.C.Cir.1978) (quoting Pacific Gas & Electric Co. v. FPC, 506 F.2d 33, 38 (1974); see American Trucking Associations v. ICC, 659 F.2d 452, 463 (5th Cir. Oct. 23, 1981) (Unit A), cert. denied, --- U.S. ----, 103 S.Ct. 1272, 75 L.Ed.2d 493 (1983); Mercury Motor Express, Inc. v. United States, 648 F.2d at 319; Brown Express, Inc. v. United States, 607 F.2d 695, 701 (5th Cir.1979); Regular Common Carrier Conference of the American Trucking Associations, Inc. v. United States, 628 F.2d 248, 250-51 (D.C.Cir.1980). The key inquiry, therefore, is the extent to which the challenged policy leaves the agency free to exercise its discretion to follow or not to follow that general policy in an individual case, or on the other hand, whether the policy so fills out the statutory scheme that upon application one need only determine whether a given case is within the rule's criterion. As long as the agency remains free to consider the individual facts in the various cases that arise, then the agency action in question has not established a binding norm. See American Trucking Associations, Inc. v. ICC, 659 F.2d at 463; Regular Common Carrier Conference of the American Trucking Associations, Inc. v. United States, 628 F.2d at 251 (if agency explicitly says new policy leaves open free exercise of informed discretion, then rights and duties have not actually been diminished, and binding norm has not been established); Guardian Federal Savings and Loan Association v. Federal Savings and Loan Insurance Corp., 589 F.2d at 667 (agency must remain prepared to defend policy in subsequent proceeding and may not claim matter is foreclosed).
 
 
 37
 As noted earlier, the Commission has explicitly stated that each case shall be decided by examining the totality of the facts bearing upon the relationship between the lessor and the shipper. Although the Commission has enumerated various criteria which establish a presumption of private carriage, this presumption remains rebuttable. In particular the Commission has stated that it will scrutinize the actual operation of apparently conforming leases to determine whether the terms have been followed. The use of such presumptions generally serves to direct the analysis but not necessarily the answer. Therefore, the use of presumptions does not reasonably transform a statement of policy into a binding norm. See Regular Common Carrier Conference of the American Trucking Associations, Inc. v. United States, 628 F.2d at 251 (use of rebuttable presumptions preserves discretion to determine each case on its own factual circumstances). In our view this case is quite similar to Guardian Federal Savings and Loan Association v. Federal Savings & Loan Insurance Corp., supra.[12] We conclude that, to the extent the Commission abides by its disclaimer of having established a binding norm, its characterization of this action as a general statement of policy was correct.
 
 
 38
 As a general statement of policy, the Commission's action is reviewed by this court only to determine whether it is arbitrary, capricious, an abuse of discretion, or otherwise contrary to law or in excess of the Commission's statutory authority. 5 U.S.C.A. Sec. 706(2)(A)-(D) (West 1977); see Mercury Motor Express, Inc. v. United States, 648 F.2d at 319; Assure Competitive Transportation, Inc. v. United States, 635 F.2d 1301, 1307 (7th Cir.1980). Under this standard our task is limited to determining "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." Bowman Transportation, Inc. v. Arkansas-Best Freight System, 419 U.S. 281, 285, 95 S.Ct. 438, 441, 42 L.Ed.2d 447 (1974); see American Trucking Association, Inc. v. United States, 642 F.2d 916, 920 (5th Cir. April 17, 1981) (court inquires only to see that statement rationally supported, that agency considered relevant factors and avoided clear errors, and that agency articulated rational connection between facts found and conclusions premised on those facts); National Tour Brokers Association v. ICC, 671 F.2d 528, 532 (D.C.Cir.1982) (review under arbitrary and capricious standard confined to whether rational basis may be found in facts of the record); Consolidated Rail Corp. v. United States, 619 F.2d 988, 993 (3d Cir.1980) (same). Thus, as long as the "agency policy is within the agency's delegated power and meets the test of reasonableness, a court may not upset it without usurping the agency's power." 2 K. Davis, Administrative Law Treatise Sec. 7.5, at 25 (2d ed. 1979). See also Baltimore Gas and Electric Co. v. National Resources Defense Council, Inc., --- U.S. ----, ----, 103 S.Ct. 2246, 2257, 76 L.Ed.2d 437, 452 (1983). We proceed to a determination of whether the policy statement satisfies these limited requirements.
 
 
 39
 IV. The Commission's Statutory Authority to Define Private Carriage.
 
 
 40
 Petitioners' primary contention is that the Commission's attempt to reformulate the test for defining private carriage was beyond its statutory authority. Petitioners advance the following three arguments in support of this contention: (1) the Motor Carrier Act requires adherence to the definition and presumptions announced in Church and in Drum; (2) adherence to the definition and the presumptions formerly relied upon are mandated by the Supreme Court's opinion in Drum; and (3) adherence to the definition and its presumptions is required by implicit Congressional approval of the Drum case. In our view these contentions must ultimately fail.
 
 
 41
 First, the parties have brought to our attention no congressional comment on either the definition of private carriage as formulated in Drum or the presumptions regarding single-source leasing adopted by the Commission in the Church and Oklahoma Furniture decisions. The only attempt by Congress to legislate with regard to the substantive definition of private carriage occurred in the 1958 amendments to the Motor Carrier Act. In those amendments, Congress ratified the Commission's decision to adopt the "primary business test" when determining whether a shipper's carriage of goods in addition to its own private carriage rendered that shipper or the carrier leased by that shipper a common or contract carrier subject to ICC permit and licensing regulations. See Nuclear Diagnostic Laboratories, Inc., Contract Carrier Application, 131 M.C.C. 578, 581-84 (1979). Although congressional explanation of the amendment centered on the continued concern for diversion of traffic from regulated carriers to illegitimate private carriers, see S.Rep. No. 1647,supra, at 23, neither the House nor the Senate attempted to formulate a comprehensive distinction between private and for-hire carriage. Rather, the amendment was aimed at a specific type of arrangement commonly used to avoid the label of for-hire carriage. See supra note 3.[13] Likewise, although the Motor Carrier Act of 1980 addressed certain limited aspects of the unregulated carriage industry, there is no discussion in either the House or the Senate Report regarding the appropriate distinction between private and for-hire carriage. Thus, there is no merit to the contention that adherence to the Drum analysis with its concomitant presumptions is mandated by congressional statements in the Motor Carrier Act and its amendments.
 
 
 42
 Similarly, we are convinced that the Drum case itself does not require continued use of the presumptions rejected by the ICC in this proceeding. Rather, throughout its opinion in Drum the Supreme Court reiterated the need to accord the Commission some discretion in determining the appropriate scope of for-hire carriage. For example, the Court commented on the evolving "technique" of analysis used by the Commission. In upholding the Commission's formulation of an appropriate definition of private carriage, the Court explicitly stated that the Commission's conclusions "were well within the range of responsibility Congress assigned to the Commission." 368 U.S. at 385, 82 S.Ct. at 415.
 
 
 43
 It is true that the Court imposed certain constraints upon the Commission's discretion. For example, the Court stated that because the statutory definitions of private and for-hire carriage "must, if they are to serve their purpose, impose practical limitations upon unregulated competition in a regulated industry, they are to be interpreted in a manner which transcends the merely formal." Id. at 375, 82 S.Ct. at 410. Moreover, the Court suggested that the Commission's occasional reformulations of the distinction between private and for-hire carriage were permissible largely because each formulation revolved around a central and implicit theme: "a purported private carrier who hires the instrumentalities of transportation from another must--if he is not to utilize a licensed carrier--assume in significant measure the characteristic burdens of the transportation business." Id. at 375, 82 S.Ct. at 410.
 
 
 44
 Indeed, since Drum the Commission has frequently restated its test of substance in terms of the "characteristic burdens of transportation." See Personnel Service, Inc.--Investigation of Operations and Practices, 110 M.C.C. 695, 704-06 (1969); Heavy Equipment Rental Co., Investigation, 98 M.C.C. 365, 394 (1964). Overall, however, the Court's opinion reflects a deference to the Commission's informed judgment as to what types of burdens are characteristic of the provision of for-hire transportation. See 368 U.S. at 385, 82 S.Ct. at 415 (Commission's belief that financial risks are a significant burden of transportation is well within range of responsibility assigned to Commission); id. at 374, 82 S.Ct. at 410 (formulation of private carriage in Drum is recent instance of Commission's developing technique of decision); id. at 376, 82 S.Ct. at 411 (Commission's current resolution of problem does not violate coherence of body of administrative and judicial precedents so far developed in this area). Finally, the Court expressly sanctioned an analysis which focuses on the totality of circumstances rather than the dispositive significance of any one factor. See id. at 384, 82 S.Ct. at 415 (emphasizing use of totalities and noting that indicia are "instruments of decision, not touchstones"; "Commission allowably dealt with this novel situation as an integral and unique problem in judgment, rather than simply as an exercise in counting commonplaces").
 
 
 45
 Although the Commission's new statement of policy abandons the presumptions regarding single-source leasing announced in Church and Oklahoma Furniture, and affirmed in Drum, the Commission has continued to adhere to an approach that requires examination of all circumstances regarding the relationship between the lessor and the shipper. Moreover, this adherence to an intensely factual determination informed by relevant criteria at least facially ensures the interpretation of private carriage "in a manner which transcends the merely formal." Id. at 375, 82 S.Ct. at 410. At most the Commission's new policy articulates new criteria for determining when the control of the transportation by the shipper indicates that the shipper has shouldered the burdens of transportation necessary to have assumed control over the lessor. Thus, rejecting the presumption of for-hire carriage arising from single source leasing, and the presumption that the owner/operator possesses the inherent power to defeat the control of the transportation by the shipper, is indicative only of the Commission's new views as to which burdens constitute significant indicia of private transportation. Compare Personnel Service, Inc.--Investigation of Operations and Practices, 110 M.C.C. at 709-10. See also supra note 8. We therefore conclude that the Supreme Court's opinion in Drum does not preclude the Commission's reconsideration of the presumptions announced in Church and Oklahoma Furniture.
 
 
 46
 Finally, petitioners assert that the Commission's long-standing interpretation of private carriage, combined with Congress' failure to articulate a differing interpretation, precludes the Commission from formulating a different test at this late date. Thus, petitioners argue that Congress has implicitly approved the standards described in Drum.
 
 
 47
 Generally, courts place great weight upon long-standing interpretations and policies announced by an agency, and closely scrutinize departure from agency precedent. See, e.g., NLRB v. Bell Aerospace Co., 416 U.S. 267, 94 S.Ct. 1757, 40 L.Ed.2d 134 (1974);[14] Atchison, Topeka & Santa Fe Railway Co. v. Wichita Board of Trade, 412 U.S. 800, 93 S.Ct. 2367, 37 L.Ed.2d 350 (1973); American Trucking Associations v. Atchison, Topeka and Santa Fe Railway, 387 U.S. 397, 87 S.Ct. 1608, 18 L.Ed.2d 847 (1967); Mercury Motor Express, Inc. v. United States, 648 F.2d 315 (5th Cir.1981); Missouri-Kansas-Texas Railroad Co. v. United States, 632 F.2d 392 (5th Cir.1980), cert. denied, 451 U.S. 1017, 101 S.Ct. 3004, 69 L.Ed.2d 388 (1981). On the other hand, the Supreme Court has stated:
 
 
 48
 [T]he Commission, faced with new developments or in light of reconsideration of the relevant facts and its mandate, may alter its past interpretation and overturn past administrative rulings and practice.... [T]his kind of flexibility and adaptability to changing needs and patterns of transportation is an essential part of the office of a regulatory agency.
 
 
 49
 American Trucking Associations v. Atchison, Topeka and Santa Fe Railway Co., 387 U.S. at 416, 87 S.Ct. at 1618 (national transportation policy may authorize Commission departure from precedent even when Congress has considered specific proposals to legislate particular change promulgated by Commission immediately prior to Commission's action); see Atchison, Topeka & Santa Fe Railway Co. v. Wichita Board of Trade, 412 U.S. at 808, 93 S.Ct. at 2375 (agency may flatly repudiate past norms, deciding that changed circumstances no longer require those norms in order to effectuate congressional policy, so long as agency clearly sets forth grounds for such departure); Missouri-Kansas-Texas Railroad Co. v. United States, 632 F.2d at 402-03 (Commission changes in guidelines valid when the result of process of weighing the public interest which is entrusted to Commission).
 
 
 50
 The Commission has seized upon its responsibility to monitor the effect of its policies on the industry, and has argued throughout this proceeding that its policy change is supported by changed circumstances. According to the Commission, these circumstances include passage of the 1980 amendments to the Motor Carrier Act and overall changes in the transportation industry. The test generally used for determining the validity of agency changes in policy is essentially the same as the test for determining whether agency action is arbitrary, capricious, or an abuse of discretion. Because both determinations depend upon the existence of a rational basis for the agency action, see Mercury Motor Express, Inc. v. United States, 648 F.2d at 319; Assure Competitive Transportation, Inc. v. United States, 635 F.2d at 1307; Association of American Railroads v. ICC, 564 F.2d at 495, we will treat these two determinations as one.
 
 
 51
 V. Basis for the Policy Change.
 
 
 52
 The Commission argues that changes in the nature of the trucking industry occurring since passage of the 1935 Act provide adequate support for its change in policy. Specifically, the Commission contends that neither the regulated sector nor the private carriage sector occupies the tenuous position it occupied in 1935.[15]
 
 
 53
 The Commission apparently infers from the increased stability of both the regulated and unregulated sectors that there is a reduced need for protection of regulated carriers from encroachment by private carriers. The Commission further reasons that reduced barriers to entry into the regulated sector decrease the likelihood of subterfuge which motivated the Commission to adopt at an early date a stringent test for defining private carriage. See All Points, Inc. --inveStigation of operAtions, 123 m.c.C. 242, 250-52 (1975). The Commission concludes that its new policy statement, retaining as it does the basic test of control announced 40 years ago, will have no "major effect on the overall balance between the regulated and private sectors of the industry." 132 M.C.C. at 769.
 
 
 54
 The Commission further argues that adopting the more lenient approach toward single-source leasing by private shippers will increase both competition and efficiency in the private sector by opening up an additional source "of fleet augmentation." Additionally, the new policy will provide added opportunities to owner/operators at a time in which they are in dire economic straits. The Commission therefore concludes that all of these factors together indicate that circumstances have changed sufficiently in 40 years to allow a corresponding change in the Commission's treatment of single-source leasing by private shippers.
 
 
 55
 As additional support for its policy change, the Commission relies upon "changes in statutory direction," 132 M.C.C. at 757, resulting from the 1980 amendments to the Motor Carrier Act. See Pub.L. 96-296, 94 Stat. 1898 (1980), codified at 49 U.S.C.A. Sec. 10101, et seq. (West 1982 Pamphlet). In particular, the Commission points to the amendments in the National Transportation Policy, which stress the promotion of "competitive and efficient transportation services," and contends that these amendments demonstrate congressional awareness of basic changes in the motor carrier industry. 49 U.S.C.A. Sec. 10101.[16] The Commission believes that a more lenient approach to single-source leasing by private carriers will provide both private carriers and owner/operators with more options when structuring their respective transportation arrangements. The Commission concludes that its reformulation of the test for private carriage will result in greater utilization of equipment and necessary support for the private carrier industry, thereby fostering the competition desired by Congress.
 
 
 56
 The Commission also points to various amendments either specifically addressed to exempt carriage or which reasonably suggest a different regulatory treatment of such carriage. For example, prior to the 1980 amendments Commission rules prohibited the hauling of the shipper's goods by a member of the shipper's corporate family, such as a wholly-owned subsidiary, without a certificate: In the Commission's view this did not constitute private carriage. Section 9 of the 1980 Act, however, removed this restriction and permitted such intercorporate hauling, provided the parent corporation owned a 100% interest in the transporting subsidiary. See 49 U.S.C.A. Sec. 10524(b). The 1980 Act also expanded various existing exemptions in order to permit more efficient use of unregulated carriage. Thus, Sec. 7 of the Act increased the number and type of exempt commodities in order to decrease the incidence of empty backhauls, and increased the exemption for motor carrier transportation incidental to air transportation.[17] 7] The Commission contends that these specific provisions all support a more lenient approach to defining private carriage in order to eliminate inefficiency and foster competition in the overall transportation industry.
 
 
 57
 In the Commission's view, however, the most significant support for its change in policy stems from the reduction in barriers to entry resulting from the amendments. For example, Sec. 5 of the 1980 Act substantially reduces the burden of proof on persons applying for common carrier certification and contract carrier licensing. See 49 U.S.C.A. Secs. 10922, 10923 (West 1982 Pamphlet).[18] The Commission emphasizes that Congress has turned away from the protectionist attitude embodied in the 1935 Act, which required strict maintenance of the line between private and common carriage in order to prevent diversions of traffic detrimental to both the shippers and the transportation industry. Rather, in announcing a transportation policy which focuses on ease of entry and competition, Congress has implicitly sanctioned more lenient treatment of nominally private carriage. Presumably these reduced standards will permit many more businesses to enter the regulated transportation industry, with the result that existing carriers will be less protected from natural competitive forces and more subject to diversions of traffic. Thus, the Commission concludes:
 
 
 58
 [T]he 1980 Act gives evidence that Congress is much less concerned than it formerly was over the possibility of diversion of traffic from existing regulated carriers. New section 10922(b)(2)(B) provides that the Commission shall not find diversion of revenue or traffic from an existing carrier to be in and of itself inconsistent with the public convenience and necessity. It is true, as several commentators point out, that this provision is in the context of admission of new carriers into the regulated industry. It has no direct application to determining the boundary line between private and for-hire carriage. But the avoidance of diversion was never an end of itself. Rather, it was a policy adopted in order to achieve an earlier regulatory objective of maintaining a stable traffic base for a relatively limited number of regulated carriers--an objective which has now been subordinated by Congress in the act in favor of heightened competition. Since fear of diversion of traffic from regulated to private carriers provided much of the motivation for the Commission's former policy, we think that Congress' lessened concern over traffic diversion can and should legitimately be considered in reappraising that policy.
 
 
 59
 We also think that the 1980 Act, by reducing the barriers to the entry of new carriers into the regulated industry, has also reduced any incentive such carriers might have to devise subterfuges to remain outside the reach of regulation. See Pacific Diesel, supra. Since the fear of subterfuges and evasion was a major part of the Commission's motivation in adopting its presumption of for-hire carriage in Church, supra, of control defeasance by owner-operators in Oklahoma, supra, and in scrutinizing owner-operator leases to shippers in subsequent cases, the greatly decreased incentives to evade regulation under the 1980 Act strongly suggest a reappraisal of both presumptions.
 
 
 60
 132 M.C.C. at 771.
 
 
 61
 Admittedly, the evidence adduced by the Commission in support of a change in circumstances is not overwhelming. A reading of the statutory language as well as the relevant House and Senate reports suggests that when Congress was speaking of greater competition in the transportation industry, it was concerned primarily with competition within the regulated transportation industry. See S.Rep. No. 641, 96th Cong., 2d Sess. 2-6 (1980).[19]
 
 
 62
 Moreover, Congress' relaxed concerns for diversion of traffic from existing carriers might be read as limited to the context of determining whether to grant certificates of public convenience and necessity. Thus, Congress' directive that the agency no longer consider diversion of traffic as itself inconsistent with public convenience and necessity may simply have been another mechanism for reducing barriers to entry into the regulated sector. See S.Rep. No. 641, supra, at 24. See generally 49 U.S.C.A. Sec. 10922 (procedure and criteria to be used in issuing certificates to common carriers). In fact, greater leniency in determining whether a particular arrangement constitutes private carriage might be viewed as inconsistent with a congressional policy of encouraging entry into the regulated sector. Cf. S.Rep. No. 641, supra, at 116 (100% ownership requirement for intercorporate hauling "preserves the essential role of private carriage, but does so with a minimum of conflict with the common carrier concept").
 
 
 63
 Finally, it is not clear what inferences may be drawn from Congress' extension of certain specific exemptions in the 1980 Act. For example, although the amendments do allow intercorporate hauling by a wholly-owned subsidiary, Congress rejected proposals that would have allowed such hauling by less than wholly-owned subsidiaries. See Economic Regulation of the Trucking Industry: Hearings Before the Committee of Commerce, Science, and Transportation on S. 2245, 96th Cong., 2d Sess. 1463-64 (1980) (Sec. 8 of the Senate bill would have exempted intercorporate hauling from regulation when the parent corporation owned 51% of transporting subsidiary). Similarly, Congress rejected a proposal aimed specifically at allowing private carriers which transport exempt commodities on a "front haul" to carry nonexempt commodities on the back haul, thereby increasing carrying capacity and eliminating inefficiencies in the private carrier sector. See id. at 1461-63. See also Economic Regulation of the Trucking Industry: Hearings before the Committee on Commerce, Science, and Transportation on S. 2245, 96th Cong., 2d Sess. 1765-1810 (1980) (testimony regarding back haul exemptions for "true owner/operators"). Further, in support of a provision in the 1980 Act exempting the transportation of processed food, the Senate specifically commented upon the extent to which private carriage had taken much of the business away from the regulated carriers:
 
 
 64
 With respect to the motor carrier transportation of [processed, nonexempt food], almost 70 percent is transported today by private carriage. In other words, by their actions shippers in this country have indicated that the regulated motor carrier system is not meeting their needs to a substantial extent.
 
 
 65
 S.Rep. No. 641, supra, at 8. The foregoing language implies a continued concern for the diversion of traffic by private carriers from the regulated carrier industry.[20]
 
 
 66
 In the end, however, we are mindful of the Commission's responsibility for reexamining its rules and policies in light of changed circumstances. See American Trucking Associations v. Atchison, Topeka and Santa Fe Railway Co., 387 U.S. at 415-16, 87 S.Ct. at 1618 (Commission's flexibility and adaptability to changing needs and patterns of transportation are essential part of the office of regulatory agency; national transportation policy is yardstick by which correctness of Commission's actions will be measured). Thus, the Commission may reject long-standing policies, interpretations, and guidelines so long as its action is rationally based and consistent with the Commission's statute. See, e.g., Atchison, Topeka & Santa Fe Railway Co. v. Wichita Board of Trade, 412 U.S. at 808, 93 S.Ct. at 2375; Mercury Motor Express, Inc. v. United States, 648 F.2d at 319; National Tour Brokers Association v. ICC, 671 F.2d at 531-33. Moreover, in finding that changed circumstances reasonably permit a change in policy an agency is entitled to rely to some extent on the experience and expertise it has acquired during the course of its existence, see Mercury Motor Express, Inc. v. United States, 648 F.2d at 319; National Tour Brokers Association v. ICC, 671 F.2d 532-33, as long as this reliance on agency experience is documented and made a part of the record so that the courts can determine whether the agency's action is facially rational. See Mercury Motor Express, Inc. v. United States, 648 F.2d at 319; National Tour Brokers Association v. ICC, 671 F.2d at 533.
 
 
 67
 As discussed above, the proposed policy change is not inconsistent with the provisions of the Motor Carrier Act. Further, we find no clear error of judgment in the Commission's assertion that competition will be enhanced by the proposed relaxation of standards with respect to single-source leasing by shippers. Even if the amendments to the National Transportation Policy were concerned only with the regulated sector, it would be rational to assume that providing owner/operators alternatives to employment solely with common and contract carriers would lead to greater competition for their services within that sector. Such competition would in turn foster a healthier transportation industry in both the regulated and unregulated sectors. See National Tour Brokers Association v. ICC, 671 F.2d at 533 (Commission may rely on experience as long as it fully explains perceptions supporting action, and makes its experience part of record).[21]
 
 
 68
 Recently, in Mercury Motor Express, Inc. v. United States, supra, a panel of the former Fifth Circuit considered a similar policy change. In Mercury Motor the Commission had announced that in light of changes in the industry it was abandoning its forty-year-old policy of denying incidental contract authority to private shippers. 648 F.2d at 317.[22] According to the Commission, the "dynamic expansion" of the motor carrier industry no longer supported the protectionist attitude behind the rule, while such factors as the need for energy efficiency clearly required reconsideration. The court thus held that the changed policy was consistent with the Motor Carrier Act and "rational on its face." Id. at 320. Here, too, we conclude that the Commission's assertion of changes in the industry, as supported by the National Transportation Policy, provides a rational basis for reconsidering and rejecting the presumptions announced in Church and Oklahoma Furniture.
 
 
 69
 Petitioners contend that MC-122 will result in an increase in subterfuge to avoid regulation, and that the new criteria effectively destroy the distinctions between private and for-hire carriage. In our view, however, it is well within the Commission's area of expertise to postulate a decreased danger of subterfuge.[23] Further, the Commission has expressly declared that it intends to maintain the distinction between private and for-hire carriage, see 132 M.C.C. at 770, and that it will continue to ferret out for-hire schemes which purport to be private shipping. Id. at 772. In our view the better arena for holding the Commission to these promises and ensuring that its determinations are made in "a manner which transcends the merely formal," United States v. Drum, 368 U.S. at 375, 82 S.Ct. at 410, will be in the context of individual enforcement proceedings. We conclude that the new policy is a rational response to the Commission's findings of changed circumstances. See Regular Common Carrier Conference of the American Trucking Associations, Inc. v. United States, 628 F.2d at 252.[24]
 
 
 70
 VI. Compliance With NEPA and EPCA.
 
 
 71
 Under the NEPA, agencies are required to consider possible environmental effects of proposed federal actions. Generally, this consideration takes the form of an Environmental Impact Statement (EIS). See 42 U.S.C.A. Sec. 4332 (West 1977). Additionally, the EPCA requires the ICC to consider the possible effect of its actions on reducing energy consumption. When necessary, this requirement includes preparing a Statement of Energy Impact (SEI). See 42 U.S.C.A. Sec. 6362(b) (West 1977). The obligations to prepare an EIS and an SEI, however, are not mandatory. Rather, the requirements of the NEPA are triggered only for "major federal actions significantly affecting the quality of the human environment," 42 U.S.C.A. Sec. 4332(2)(C), and the EPCA requires an energy statement only where practicable. 42 U.S.C.A. Sec. 6362(b). Thus, with regard to both Statements, the Commission is accorded a large amount of discretion in determining either the necessity for preparing the Statement or the scope of the inquiry it will perform. See Mercury Motor Express, Inc. v. United States, 648 F.2d at 319-20 (decision by Commission that action is neither major federal action significantly effecting human environment nor major regulatory action under the EPCA is reversible only if arbitrary, capricious or abuse of discretion); American Trucking Association, Inc. v. United States, 642 F.2d at 923 (5th Cir.1981) (agency may reasonably conclude that impact statement not necessary); Sierra Club v. Hassell, 636 F.2d 1095, 1098 (5th Cir.1981) (Unit B). We conclude that the agency's determination that the proposed action is expected to reduce fuel consumption in the industry was sufficient under the EPCA. Further, the Commission's conclusion that no environmental impacts are expected comports with the Commission's own regulations and general practice. See 49 C.F.R. Secs. 1105.6, 1106.5.
 
 CONCLUSION
 
 72
 On the basis of the foregoing, the petitions for review of MC-122 are DENIED.
 
 
 
 [1]
 Petitioners in these consolidated actions include Ryder Truck Lines, Inc., American Trucking Associations, Inc., Common Carrier Conference-Irregular Route, Regular Common Carrier Conference, National Tank Truck Carriers, Inc., Specialized Carriers and Rigging Association, National Automobile Transporters Association, Bowman Transportation, Inc., and the Steel Carriers Tariff Association, Inc. The following parties are intervenors in this action: the National Association of Regulatory Utility Commissioners, the American Movers Conference, and the International Brotherhood of Teamsters, Chauffeurs, Warehousemen, and Helpers of America. All petitioners and intervenors hereinafter will be referred to collectively as "petitioners."
 
 
 [2]
 In Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir.1981) (en banc), this court adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981. Id. at 1209
 
 
 [3]
 In Church the Commission found that the arrangement at issue did constitute for-hire transportation. The particular facts which led the Commission to hold that the shipper had not exercised sufficient control over the lessor were: (1) the lessor was responsible for maintenance of the vehicle; (2) the lessor paid operating expenses, drivers' salaries, taxes and unemployment compensation; and (3) the lessor provided liability and collision insurance. See 27 M.C.C. at 195-96
 
 
 [4]
 The "primary business" test may be viewed as the overall definition of private carriage, while the "control" test, and later, the "substance" test, see below, are the means for determining whether transportation is incidental to a primary business. See Farris & Southern, Federal Regulatory Policy Affecting Private Carrier Trucking, 49 I.C.C.Prac.J. 503, 512-15 (1982). Congress' adoption of the primary business test was caused by the proliferation of so-called "buy-sell" arrangements under which carriers attempted to avoid ICC regulation by literally purchasing the goods to be transported and then selling them upon reaching their destination. By engaging in such arrangements carriers would literally be shipping their own goods: superficially, this would seem to constitute private carriage. Both the Commission and Congress, however, saw the arrangement quite differently. See Brooks Transp. Co. v. United States, 93 F.Supp. 517 (E.D.Va.1950), aff'd, 340 U.S. 925, 71 S.Ct. 501, 95 L.Ed. 668 (1951) (mem.). Thus, the Senate Report states that the amendment was intended "to correct most of the abuses that have arisen in the name of private carriage and yet would not in any way jeopardize or interfere with the operations of private carriers to provide transportation service--even if the charge is made--as an integral part of a primary business function." S.Rep. No. 1647, supra, at 5. See also Nuclear Diagnostic Laboratories, Inc., Contract Carrier Application, 131 M.C.C. 578, 581-84 (1979). Perhaps more significant, however, was the Senate's continued concern with the diversion of traffic from regulated carriers to illegitimate private carriers. Such illegitimate carriers could avoid not only ICC rate and licensing requirements, but could also avoid payment of federal excise taxes. S.Rep. No. 1647, supra, at 23
 
 
 [5]
 See generally, M. Fair & J. Guandolo, Transportation Regulation 84 (8th ed. 1979)
 
 
 [6]
 The financial factors found by the Commission in Drum, which proved the existence of for-hire carriage, were as follows: (1) the owner/operators provided exclusive use for a continuous period of time; (2) equipment was furnished, maintained and driven by the owners; (3) all operating costs and trip expenses were borne by the owners; and (4) the owners guaranteed a fixed cost for the transportation and assumed the risk of all losses. 79 M.C.C. at 412. One authority has identified 14 factors that often are considered by the Commission in making its determination. See generally, Matthews, Truck Leasing by Shippers and the Problem of Dangling Instrumentalities, 32 I.C.C.Prac.J. 370 (1964). For a concise history of the development of the Commission's views as to what constitutes private carriage, see Farris & Southern, supra note 3, at 505-16
 
 
 [7]
 The final policy statement was to become effective 30 days after publication in the Federal Register, thus complying with Sec. 4 of the Administrative Procedure Act. See 5 U.S.C.A. Sec. 553(d) (West 1977)
 
 
 [8]
 According to the Commission:
 [W]e intend to focus on control, responsibility, and the performance of key organizing and management functions of a transportation service as the critical elements of determining who is performing service, and in characterizing the type of carriage being performed.
 
 
 [132]
 M.C.C. at 777
 
 
 [9]
 The list of minimum requirements is as follows: (1) the leased equipment must be exclusively committed to the lessee's use for the term of the lease; (2) the lessee must have exclusive dominion and control over the transportation service during the term of the lease; (3) the lessee must maintain liability insurance for any injury caused in the course of performing the transportation service; (4) the lessee must be responsible for compliance with safety regulations; (5) the lessee must bear the risk of damage to cargo; and (6) the term of the lease must be for a minimum period of 30 days. 132 M.C.C. at 778-79. According to the Commission, when the foregoing terms are embodied in a lease, then a presumption of private carriage will arise. Additionally, the Commission enumerated ten other factors which, though not conclusive, are entitled to weight: (1) whether the lease is in writing; (2) whether the lease is for round trips; (3) whether the driver becomes the lessee's employee; (4) whether the equipment is sometimes driven by a person other than the owner/operator or someone selected by him; (5) whether the lease is of tractor only, or of tractor and trailer; (6) who assumes the risk of loss or damage to the equipment, and who pays for fire, theft, and collision insurance thereon; (7) whether the lessee pays or reimburses the driver for such expenses as fuel, oil, tolls, en route repairs, and loading/unloading charges; (8) whether the lessor is required to repair and maintain the equipment; (9) whether the lease provides for some fixed minimum payment, regardless of use; and (10) whether the lessee is assisting the lessor to finance the equipment, and/or whether it holds legal title in trust for the lessor. Id. at 780-82. The primary thrust of the Commission's enumeration is to deemphasize certain of the factors referred to in Drum as "significant burdens of transportation." 368 U.S. at 385, 82 S.Ct. at 415. In particular, the Commission no longer views as highly significant such factors as whether the shipper has avoided the need for capital investment, whether the lessor assumes the risk of non-utilization of property, whether maintenance is performed at the expense of the lessor, and whether compensation is based on mileage or is at a flat fee. Compare 132 M.C.C. at 776 with Heavy Equipment Rental Co., Investigation, 98 M.C.C. 365 (1964). According to the Commission, other factors are equally or more indicative of private carriage. See 132 M.C.C. at 776 ("Our present view of what the term 'characteristic burdens of transportation' encompasses is not the same as that utilized in the Commission's earlier decisions")
 
 
 [10]
 The Commission's list of criteria which give rise to a presumption that service is private carriage is comparable to the criteria now used to determine whether an owner/operator may lease his equipment and services to a regulated common carrier. Indeed, the Commission has explicitly stated that henceforth the same test of control shall govern regardless of whether the user is a regulated carrier or a private shipper:
 When a private carrier furnishes service in vehicles owned and operated by others, it must control the service to the same extent as if it owned the vehicles, but need control the vehicles only to the extent necessary to be responsible to the public and the Department of Transportation.
 
 
 [132]
 M.C.C. at 777 (paraphrasing standard of control used for leases by owner/operators to regulated carriers, see Lease and Interchange of Vehicles by Motor Carriers, 52 M.C.C. 675, 681 (1951)), modified, 64 M.C.C. 361 (1955), modified, 68 M.C.C. 553 (1956); see 49 C.F.R. Sec. 1057.11-.12. During the course of this proceeding, the Commission placed great reliance on the inherent logic of applying the same test of control to private shippers that has always been applied to common carriers leasing from a single source. The logic is not compelling, however. As the Commission points out, the use of different standards of "control," depending upon whether the lessee is a shipper or a regulated carrier, may be explained by the earlier policy of encouraging owners and operators to ally themselves with the regulated industry. By affirmatively discouraging the use of owner/operators by shippers, the ICC could ensure that they would be regulated by virtue of their relationship to a regulated carrier. See 132 M.C.C. at 767. Thus, the Commission argues, because Congress is no longer concerned with protecting carriers from diversions of traffic, there is no reason to continue discouraging owner/operators from working for private shippers. This argument has a superficial appeal, but is vulnerable in several respects. First, the Commission's parity argument ignores the reality of the regulations regarding the owner/operator-common carrier relation. Regulated carriers which utilize the services of owner/operators have for some time been subject to "Truth in Leasing" regulations which are aimed primarily at protecting owner/operators. See 49 C.F.R. Sec. 1057. The requirements contained in those regulations go much further toward ensuring that common carriers assume control and responsibility for leased owner/operators than anything the Commission has proposed as between shippers and owner/operators. Second, a more relaxed standard of control in the regulated carrier context would be reasonable because there is no possibility for subterfuge; owner/operators hauling goods for others through some kind of arrangement with a regulated carrier will be regulated in any event, either by direct regulation of the owner/operator, or, if controlled by the carrier, by regulation of the carrier. There can be no escape from regulation. It is for precisely this reason, i.e., escaping regulation, that owner/operators may attempt to lease to private carriers. Thus, the potential for subterfuge is present only in the private carriage context. Further, the Commission's "parity" argument does not take into account the significant reasons, other than economic, for encouraging owner/operators to bring themselves under the control of regulated rather than private carriers. See Record at 155-71 (documenting safety requirements imposed by common carrier on owner/operators). For these reasons, the Commission's attempt to equate the control requirements in the regulated and private context is not, by itself, persuasive
 
 
 [11]
 Section 553 requires generally that the agency provide notice of a proposed rule-making in the Federal Register, reference to the legal authority under which the rule is proposed, and a description of the subjects and issues involved. Further, Sec. 553 requires that interested parties have an opportunity to submit relevant data, comments, and arguments. Finally, the agency must publish the rule 30 days prior to its effective date, and incorporate in the rule a "concise general statement" of the rule's basis and purpose. See 5 U.S.C.A. Sec. 553 (West 1977). However, Sec. 553 exempts from the "notice and comment" requirements "interpretive rules, general statements of policy, or rules of agency organization, procedure, or practice." 5 U.S.C.A. Sec. 553(b)(A) (emphasis added)
 
 
 [12]
 In Guardian Federal Savings and Loan, the agency promulgated criteria by which to measure the adequacy of audits required of certain lending institutions. The court held that although the criteria were quite specific, nonetheless they were not determinative of the adequacy of an audit, and the agency remained free to accept nonconforming audits. See 589 F.2d at 666-68. Likewise, although a lease between a shipper and lessor may comply with the terms recommended by the Commission's policy statement, if the facts indicate that the actual operation of the arrangement constitutes the provision of transportation services, or if factors above and beyond the provisions contained in the lease indicate same, then the Commission remains free to deny private carrier status
 
 
 [13]
 The following excerpt from House Report 1922 is indicative of the sentiments expressed in support of the amendment:
 This amendment provides that no person shall, in connection with any other business enterprise, transport property by motor vehicle in interstate or foreign commerce unless such transportation is incidental to, and in furtherance of, the primary business enterprise (other than transportation) of such person. There is no intention on the part of this committee in any way to jeopardize or interfere with bona fide private carriage, as recognized in [Brooks Transp. Co. v. United States, 340 U.S. 925, 71 S.Ct. 501, 95 L.Ed. 668 (1951), aff'g 93 F.Supp. 517 (E.D.Va.1950) ].
 H.R.Rep. No. 1922, supra, at 18.
 
 
 [14]
 Although NLRB v. Bell Aerospace Co. involved an agency interpretation of its statute rather than a policy statement, the analysis used by the Supreme Court is instructive. In Bell, the NLRB had certified a union as the bargaining representative of a group of "managerial employees." In so doing, the NLRB rejected its long-standing interpretation that managerial employees are not protected by the labor laws; instead, the NLRB held that only managerial employees responsible for "the formulation and implementation of labor relations policies" are excluded by the National Labor Relations Act. 416 U.S. at 269-72, 94 S.Ct. at 1759-61. The Supreme Court reversed the NLRB, holding that the Board was bound by its earlier, long-standing interpretation. In support of its holding, the Court relied primarily on Congress' legislative reaction to the NLRB's interpretation at the time of the Taft-Hartley Act. When drafting the Act, Congress inserted specific provisions to make clear that certain types of employees were excluded by the Act. In other instances, however, Congress explicitly found it unnecessary to legislate with regard to certain employees, including managerial employees, because such employees already were excluded under the Board's interpretation of the NLRA. See id. at 277-84, 94 S.Ct. at 1763-67. Subsequent to passage of the Taft-Hartley Act, the Board continued to adhere to this interpretation for over two decades. Thus, the Court concluded that Congress' express reliance on the Board's interpretation, combined with the Board's long-standing adherence, made that interpretation binding on the Board. See id. at 285-89, 94 S.Ct. at 1767-69. See also Association of American Railroads v. ICC, 564 F.2d 486, 493 (D.C.Cir.1977) ("doctrine of reenactment" applies only if Congress was aware of agency interpretation and affirmatively indicated intent not to change interpretation). As indicated earlier, there is no evidence that Congress has made any relevant statements regarding Drum sufficient to call into play the doctrine of reenactment
 
 
 [15]
 See 132 M.C.C. at 768 (motor carrier industry bears little resemblance to precarious, fragmented, and unstable industry of the mid-30's). According to the Commission, approximately 40% of truck carriage in this country is transported by private carriers, and private carriers outnumber regulated carriers 9 to 1. Id. at 769
 
 
 [16]
 The 1980 amendments added the following language to the National Transportation Policy:
 [I]t is the policy of the United States Government [to provide for the impartial regulation of the modes of transportation subject to this subtitle, and in regulating those modes--]
 ....
 (7) with respect to transportation of property by motor carrier, to promote competitive and efficient transportation services in order to (A) meet the needs of shippers, receivers, and consumers; (B) allow a variety of quality and price options to meet changing market demands and the diverse requirements of the shipping public; (C) allow the most productive use of equipment and energy resources; (D) enable efficient and well-managed carriers to earn adequate profits, attract capital, and maintain fair wages and working conditions; (E) provide and maintain service to small communities and small shippers; (F) improve and maintain a sound, safe, and competitive privately-owned motor carrier system; (G) promote greater participation by minorities in the motor carrier system; and (H) promote intermodal transportation.
 Pub.L. 96-296, 94 Stat. 793 (1980), codified at, 49 U.S.C.A. Sec. 10101(a)(7) (West 1982 Pamphlet).
 
 
 [17]
 See 49 U.S.C.A. Sec. 10526 (West 1982 Pamphlet); H.R.Rep. No. 1069, supra, at 18, reprinted in 1980 U.S.Code Cong. & Ad.News 2283, 2300 (to alleviate backhaul problem unregulated motor carrier should be allowed to transport certain farm supply items back to areas of agricultural production); id. at 19, reprinted in 1980 U.S.Code Cong. & Ad.News 2301 (discussing purpose of expanding "incidental-to-air" exception)
 
 
 [18]
 The House Report states:
 Section 5 reflects the Committee's strong belief that increased competition and potential competition will bring about the most efficient and economical delivery of transportation service to the public.
 The new entry section provides for a balanced approach to entry, which, by lessening the burden of proof on applicants and correspondingly increasing the burden on persons opposing the application, will encourage new applicants to file for authority to provide needed service.
 H.R.Rep. No. 1069, supra, reprinted in 1980 U.S.Code Cong. & Ad.News 2283, 2296.
 
 
 [19]
 According to the Senate Committee, the central feature of the 1980 Act was the reduction of entry barriers into the regulated sector. This goal would be achieved primarily by lessening the "public necessity and convenience" requirement necessary to secure certification, and by creating a presumption that applicants would operate in the public necessity and convenience. Further, the amendment reduced the ICC's power to regulate motor carrier rates. However, the Committee stressed the need for "entry freedom" in order to "produce a competitive environment in which rates will not be excessively high." S.Rep. No. 641, supra, at 6. This reference to competitive environment apparently is addressed primarily to the regulated sector: The competitive environment would be achieved by balancing ease of entry with rate flexibility. Id. at 11. The House Report mirrors the Senate's concerns and goals. See H.R.Rep. No. 1069, supra, at 8-17, reprinted in 1980 U.S.Code Cong. & Ad.News 2290-99
 
 
 [20]
 Various petitioners have asserted that in fact Congress considered and rejected proposals to accomplish what the Commission has here sought to do. Our review of the legislative materials, however, has not disclosed any specific proposals debated and rejected. Moreover, even if Congress had been confronted with such legislative proposals, we would not necessarily conclude that the Commission was precluded from acting on its own. In its report, the Senate stated:
 In addition to the specific provisions of this bill, there are other areas where the Committee did not act, either because it approved current Commission policy or felt that the Commission was the proper forum for the interested parties to address the issues.
 S.Rep. No. 641, supra, at 4. This statement by Congress substantially weakens any argument that through its inaction Congress has prohibited the changes sought by the Commission in its policy statement. Petitioners argue further, however, that in effect this policy statement is an attempt to institute "master licensing" based on general findings and conclusions rather than individual adjudications. Congress specifically prohibited such an approach with regard to certification. See 49 U.S.C.A. Sec. 10922(b). In our view, however, petitioners' contention is without merit. See American Trucking Ass'n, Inc. v. United States, 642 F.2d at 920-22.
 
 
 [21]
 It is important to reflect on the fundamental change rendered by the 1980 amendments to the Motor Carrier Act. From 1935 until the present, Congress has steadfastly adhered to the goal of a stable and efficient transportation system. From 1935 until 1980, the primary means for securing such a system was by protecting a relatively small pool of common and contract carriers. In 1980, however, Congress apparently decided that the goal of a stable and efficient system now could be attained by substantially greater competition
 
 
 [22]
 Under the rule of Geraci Contract Carrier Application, 7 M.C.C. 369 (1938), the Commission would generally deny common or contract authority to a private shipper unless it could be shown that the incidental authority would in no way impinge upon the interests of existing regulated carriers. This rule was deemed necessary to protect a weak industry
 
 
 [23]
 It should be recalled that the danger of subterfuge was largely the cause for the Commission's heretofore strict reading of private carriage. Of course, should subterfuge continue as a threat to a stable and efficient regulated industry, we expect the Commission to respond accordingly
 
 
 [24]
 In Regular Common Carrier Conference, supra, a panel of the United States Court of Appeals for the District of Columbia Circuit approved a similar ICC policy change. The court added a caveat, however, which we deem particularly appropriate, and therefore adopt:
 We emphasize that, although we do not set aside the Commission's pronouncement, neither do we place an imprimatur on certain ambiguous--and perhaps legally unsound--comments in it.... [O]nly subsequent adjudications will reveal whether, as petitioners fear, the Commission is attempting to evade [a] statutory requirement .... If such an attempt is revealed, it will then be proper for a court to act.
 628 F.2d at 252. In particular, we have some concern with some of the Commission's language which might be interpreted to place overwhelming significance upon the rather vague concept of "a complete transportation service," 132 M.C.C. at 773, as a prerequisite for finding for-hire carriage. The Commission describes this concept only as involving "key management and organizational functions that characterize a transportation company," including "dispatch, scheduling movements, and general coordination." Id. An overemphasis on this concept, and a pro-private carriage bias in the application thereof, could result in a complete blurring of the line between private and for-hire carriage. For example, there would be serious question about a finding of private carriage in the case of a single owner/operator who controlled all of his own activities subject only to a shipper's designation of a pick up time and place and a time and place of destination. Such an owner/operator would seem clearly, under any reasonable standard, to be hauling the goods of another; or conversely, the arrangement would seem clearly not to reflect a "shipper or manufacturer which transports its own goods." Id. at 787. And yet, we cannot be sure such an owner/operator, who in effect manages and schedules only his own activities, would fall clearly within the "complete transportation service" concept. Our concern is alleviated to a great extent by the fact that the Commission's decision also places significant reliance on whether or not the shipper exercises control and responsibility, and on the Commission's assurances that the determination will be based upon the totality of the circumstances, that the practical distinction between private and for-hire carriage will be maintained, and that subterfuges will not be tolerated. Moreover, litigants will be free to challenge the Commission's application of the instant policy in individual enforcement proceedings.
 We are satisfied that the Commission's policy, if applied in a reasonable manner, is a rational response to changed circumstances, and is within the range of responsibility assigned the Commission by Congress.